Carrie A. McMELLON; Lori Dawn White; Kathy D. Templeton; Cheri Call, Plaintiffs–Appellants,

v.

UNITED STATES of America; United States Army Corps Of Engineers, Defendants–Appellees.

No. 02–1494.

United States Court of Appeals, Fourth Circuit.

Argued: Dec. 2, 2003.

Decided: Oct. 14, 2004.

**ARGUED:** Jay Douglas Patton, Schroeder, Maundrell, Barbiere & Powers, Cincinnati, Ohio, for Appellants. Dana Joan Martin, Civil Division, United States Department of Justice, Washington, D.C., for Appellees. **ON BRIEF:** Todd M. Powers, Schroeder, Maundrell, Barbiere & Powers, Cincinnati, Ohio, for Appellants. Robert D. McCallum, Jr., Assistant Attorney General, Kasey Warner, United States Attorney, Michael L. Keller, Assistant United States Attorney, Stephen R. Campbell, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Appellees.

Before WILKINS, Chief Judge, and WIDENER, WILKINSON, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER, KING, GREGORY, SHEDD, and DUNCAN, Circuit Judges.

Vacated and remanded by published opinion. Judge TRAXLER wrote the opinion for the court, in which Chief Judge

WILKINS and Judges WILKINSON, WILLIAMS, KING, SHEDD, and DUNCAN concurred, and in which Judge NIEMEYER concurred as to Parts I, II, and IV, and in which Judges MICHAEL and MOTZ concurred as to Parts I, II, III, and IV(A). Judge WILKINSON wrote a concurring opinion. Judge NIEMEYER wrote an opinion dissenting from Part II of the opinion of the court. Judge MOTZ wrote an opinion, in which Judge MICHAEL joined, dissenting from Part IV(B) and V of the opinion of the court. Judges WIDENER, LUTTIG, and GREGORY each wrote dissenting opinions.

TRAXLER, Circuit Judge:

Plaintiffs Carrie A. McMellon, Lori Dawn White, Kathy D. Templeton, and Cheri Call seek damages under the Suits in Admiralty Act, 46 U.S.C.A.App. §§ 741–52 (West Supp.2003) (the "SIAA" or the "Act") for injuries they suffered when they went over the gates of the Robert C. Byrd Locks and Dam while riding jet skis. The district court granted summary judgment in favor of the government, and the plaintiffs appealed. A divided panel of this court concluded that prior precedent from this circuit foreclosed the government's argument that the Suits in Admiralty Act contained an implied discretionary function exception that barred the plaintiffs' claims. The panel also concluded that the government had a duty to warn about the existence of the dam, and the panel reversed the district court's grant of summary judgment and remanded for further proceedings. See McMellon v. United States, 338 F.3d 287 (4th Cir.2003) ("McMellon I ").

The government filed a petition for rehearing en banc with regard to the discretionary function exception issue. Sitting en banc, we now conclude that the government's waiver of sovereign immunity reflected in the Suits in Admiralty Act is subject to an implied exception similar to the discretionary function exception con-tained within the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671–2680 (West 1994 & Supp.2003). Accordingly, we vacate the district court's summary judgment order and remand to allow the district court to determine whether the facts of this case fall within that exception to the waiver of sovereign immunity and to conduct any other proceedings that might become necessary.

I.

The relevant facts are set out in detail in the panel's opinion, and we will only briefly recount them here. The plaintiffs were riding two jet skis on the Ohio River in the vicinity of the Robert C. Byrd Locks and Dam, a government-owned and operated facility on the Ohio River. The plaintiffs approached what they believed to be a bridge but which turned out to be the gates of the dam. Unable to stop or turn around, the plaintiffs were injured when they went over the gates and dropped approximately twenty-five feet to the water below. At the time of the accident, there were several warning signs on the upstream side of the dam, but the plaintiffs did not see them, and their evidence indicated that the signs were difficult to see from the river. The plaintiffs brought this action under the SIAA, alleging that the government had a duty to warn about the dangers of the dam and that the signs in place were inadequate to satisfy this duty.

The government moved to dismiss, arguing that it was protected by an implied discretionary function exception to the SIAA's waiver of sovereign immunity. The government also moved for summary judgment on the merits of the plaintiffs' claims on the grounds that it had no duty to warn about the dam and that the warnings it provided were, in any event, adequate.

Relying on prior authority from this court, the district court rejected the government's claim that it was protected by an implied discretionary function exception. The court, however, granted the government's motion for summary judgment, concluding that the government had no duty to warn about the dam. The panel in *McMellon I* agreed with the district judge on the first point, but reversed the grant of summary judgment, concluding that the government in fact had a duty to warn. As noted above, we granted rehearing *en banc* to consider whether the SIAA contains an implied discretionary function exception to its waiver of sovereign immunity.

## II.

At the heart of the question presented to this *en banc* court is the continuing viability of *Lane v. United States,* 529 F.2d 175 (4th Cir.1975). In *Lane,* this court flatly rejected the argument that a discretionary function exception should be read into the SIAA. After *Lane,* however, two cases from this circuit arguably applied some form of a discretionary function exception to cases arising under the SIAA. *See Tiffany v. United States,* 931 F.2d 271, 276–77 (4th Cir.1991); *Faust v. South Carolina State Highway Dep't,* 721 F.2d 934, 939 (4th Cir.1983).

Because we are sitting *en banc,* there is no doubt that we have the power to overrule *Lane* should we conclude it was wrongly decided. *See, e.g., United States v. Lancaster,* 96 F.3d 734, 742 n. 7 (4th Cir.1996) (en banc). The panel opinions in this case, however, raised the question of whether a panel of this court may likewise overrule a decision issued by another panel. The question of the binding effect of a panel opinion on subsequent panels is of utmost importance to the operation of this court and the development of the law in this circuit. Accordingly, before considering the merits of the discretionary function question, we first address this important procedural issue.[1]

■ A number of cases from this court have stated the basic principle that one panel cannot overrule a decision issued by another panel. This statement is typically made in the course of a party's request that a panel opinion be overruled by another panel. *See, e.g., United States v. Prince–Oyibo,* 320 F.3d 494, 497–98 (4th Cir.), *cert. denied,* 540 U.S. 1090, 124 S.Ct. 957, 157 L.Ed.2d 796 (2003); *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 271 n. 2 (4th Cir.2002); *United States v. Chong,* 285 F.3d 343, 346 (4th Cir.2002); *Potomac Elec. Power Co. v. Electric Motor & Supply, Inc.,* 262 F.3d 260, 264 n. 2 (4th Cir. 2001); *Young v. City of Mount Ranier,* 238 F.3d 567, 579 n. 9 (4th Cir.2001). Instances of conflicting panel opinions, however, are apparently fairly uncommon in this circuit, given the paucity of cases explaining how such conflicts should be re-

---

**1.** Judge Niemeyer writes separately to note his strong disagreement with our disposition of this question and with our decision to even address this issue. Judge Niemeyer believes this portion of our opinion is advisory (and ill-advised), given that we are sitting en banc and thus quite clearly have the power to overrule an opinion issued by a three-judge panel. Judge Niemeyer accuses the majority of reaching this issue "simply because it believes [the issue] important." Opinion of Judge Niemeyer, *infra* at 37. We note, however, that it was Judge Niemeyer himself who made this an important issue *in this case* by virtue of his dissenting panel opinion. In that opinion, Judge Niemeyer expressed the view that three-judge panels faced with an intra-circuit conflict should, in certain circumstances, overrule the opinion that the panel believes was wrongly decided. Because the question did arise in this case, we believe it is perfectly appropriate for us to resolve the question in this case.

solved. Nonetheless, we have made it clear that, as to conflicts between panel opinions, application of the basic rule that one panel cannot overrule another requires a panel to follow the earlier of the conflicting opinions. *See Booth v. Maryland,* 327 F.3d 377, 383 (4th Cir.2003).

Most of the other circuits agree and follow the earlier of conflicting panel opinions. *See, e.g., Hiller v. Oklahoma ex rel. Used Motor Vehicle & Parts Comm'n,* 327 F.3d 1247, 1251 (10th Cir.2003) (explaining that when panel opinions are in conflict, "we are obligated to follow the earlier panel decision over the later one"); *Morrison v. Amway Corp.,* 323 F.3d 920, 929 (11th Cir.2003) ("When faced with an intra-circuit split we must apply the earliest case rule, meaning when circuit authority is in conflict, a panel should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel." (internal quotation marks omitted)); *Southwestern Bell Tel. Co. v. City of El Paso,* 243 F.3d 936, 940 (5th Cir.2001) ("When two holdings or lines of precedent conflict, the earlier holding or line of precedent controls."); *Kovacevich v. Kent State Univ.,* 224 F.3d 806, 822 (6th Cir.2000) ("[W]e must defer to a prior case when two panel decisions conflict."); *Ryan v. Johnson,* 115 F.3d 193, 198 (3rd Cir.1997) ("Under Third Circuit Internal Operating Procedure 9.1, when two decisions of this court conflict, we are bound by the earlier decision."); *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed.Cir.1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc.* Where there is direct conflict, the precedential decision is the first." (citations omitted)). The Eighth Circuit, however, follows a different approach—a panel "faced with conflicting precedents [is] free to choose which line of cases to follow."

*Graham v. Contract Transp., Inc.,* 220 F.3d 910, 914 (8th Cir.2000).

We believe the better practice is the one articulated by the panel majority and followed by most other circuits. When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court. We recognize, of course, that application of this rule does require a panel to effectively ignore certain opinions duly decided by a properly constituted panel of the court. And as pointed out by Judge Niemeyer in *McMellon I,* to ignore a panel opinion is, at least on one level, inconsistent with our rule prohibiting one panel from overruling another panel opinion. *See Walker v. Mortham,* 158 F.3d 1177, 1189 (11th Cir.1998) ("Of course, by adopting the 'earliest case' rule to resolve intra-circuit splits, we are still in a sense ignoring the prior panel precedent rule—by choosing one line of cases, we are implicitly overruling the other line of cases. This is, however, a necessary consequence of an intra-circuit split...."). The other alternative (followed by the Eighth Circuit), however, suffers from precisely the same problem, because it allows a panel to ignore one panel opinion in favor of another panel opinion that it finds more persuasive. Thus, neither approach is a perfect one. In our view, however, the alternative approach utilized by the Eighth Circuit has certain negative attributes that are not shared by the earliest-case-governs rule.

The alternative approach would have the effect of extending the life of intra-circuit conflicts indefinitely, as each subsequent panel considering an issue over which there was once a conflict would apparently be free to decide for itself which prior decision it wished to follow. This iteration of the rule could almost encourage the

creation of intra-circuit conflicts. A panel displeased with the way an issue previously had been decided could simply ignore the case with which it disagreed, thus creating a conflict and at least the possibility that the analysis of the second panel opinion would ultimately prevail.

By contrast, requiring subsequent panels to follow the earliest of the conflicting cases does not allow the possibility of manufactured intra-circuit conflicts. In addition, the earliest-case-governs rule brings intra-circuit conflicts to an end as soon as they are recognized. *See Walker,* 158 F.3d at 1189 n. 25 ("The 'earliest case' rule also has the virtue (if consistently applied) of bringing intra-circuit splits to a screeching halt; the 'common sense and reason' rule, in contrast, can drag such splits out indefinitely as different panels reach different conclusions about what is common-sensical and reasonable."). The rule that requires subsequent panels to follow the earliest case in the event of a conflict thus minimizes the instability and unpredictability that intra-circuit conflicts inevitably create.

While we recognize that a three-judge panel has the statutory and constitutional power to overrule the decision of another three-judge panel, we believe that, as a matter of prudence, a three-judge panel of this court should not exercise that power. Accordingly, we conclude that when there is an irreconcilable conflict between opinions issued by three-judge panels of this court, the first case to decide the issue is the one that must be followed, unless and until it is overruled by this court sitting *en banc* or by the Supreme Court.[2]

### III.

We now proceed to the question that we granted rehearing *en banc* to con-sider: Whether we should overrule *Lane* and read into the SIAA a discretionary function exception. To put this issue in the proper context, some historical background is necessary.

During the first part of this century, the United States government had yet to waive its sovereign immunity in admiralty actions. Thus, if a vessel owned or operated by the government caused damage to a private vessel, the private owner was without recourse, even though the government, of course, could seek damages from a private vessel owner who negligently damaged a government vessel. *See Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 219, 65 S.Ct. 639, 89 L.Ed. 901 (1945). Congress frequently passed private bills authorizing relief for particular vessel owners damaged by the government's actions, a method that proved to be rather cumbersome and inefficient, *see id.,* particularly once the government, through the Shipping Board, became the owner of many merchant vessels. *See Marine Coatings of Alabama v. United States,* 71 F.3d 1558, 1560 (11th Cir.1996). In 1916, Congress passed the Shipping Act, 46 U.S.C.A.App. § 801, which provided that "Shipping Board vessels while employed as merchant vessels were subject to all laws, regulations, and liabilities governing merchant vessels regardless of the fact that the United States owned or had an interest in them." *Canadian Aviator,* 324 U.S. at 219, 65 S.Ct. 639 (internal quotation marks omitted).

The Supreme Court interpreted the Shipping Act to authorize *in rem* actions and attendant arrests and seizure of government vessels. *See The Lake Monroe,* 250 U.S. 246, 39 S.Ct. 460, 63 L.Ed. 962 (1919). Congress responded to that deci-

---

2. Of course, a panel faced with an intra-circuit conflict is always free to suggest an *en* banc hearing or rehearing, so that the full court can more quickly resolve the conflict.

sion in 1920 by passing the Suits in Admiralty Act, which prohibited *in rem* actions but instead authorized *in personam* admiralty actions in cases involving government-owned or operated vessels that were "employed as a merchant vessel." SIAA § 2, 41 Stat. 525–26 (1920). The SIAA expressly granted the government the right to take advantage of all of the statutory limitations of liability available to private parties,[3] *see* SIAA § 6, 41 Stat. 527 (1920), but the Act did not include any exceptions to its waiver of sovereign immunity for the cases that fell within its scope.

For purposes of the original SIAA, a public vessel (such as a naval vessel) was distinct from a government-owned or operated merchant vessel. Accordingly, "the Government's sovereign immunity still prevented a claimant from bringing an *in rem* or any other proceeding in admiralty against the United States for injury caused by a public vessel." *Marine Coatings,* 71 F.3d at 1560. Congress rectified that anomaly in 1925 by passing the Public Vessels Act (the "PVA"), which authorized *in personam* admiralty actions seeking recovery for "damages caused by a public vessel of the United States." 46 U.S.C.A.App. § 781 (West 1975). Like the SIAA, the PVA contained no exceptions to its waiver of sovereign immunity for any particular claims otherwise falling within its scope.

When PVA and SIAA were enacted, Congress had yet to implement a waiver of the government's sovereign immunity as to non-maritime torts. While Congress had long believed that "the Government should assume the obligation to pay damages for the misfeasance of employees in carrying out its work," *Dalehite v. United States,* 346 U.S. 15, 24, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), it took Congress nearly thirty years to reach agreement on the form that the waiver of sovereign immunity should take, *see id.* Finally, in 1946, Congress passed the Federal Tort Claims Act ("FTCA"), 28 U.S.C.A. §§ 2671–2680 (West 1994 & Supp.2003), which waives sovereign immunity for most torts committed by government employees, subject to several statutory exceptions. *See* 28 U.S.C.A. § 2680.

The most important of these exceptions to the waiver of sovereign immunity is the discretionary function exception. In 1942, while Congress was working on what would ultimately become the FTCA, an assistant attorney general testified before the House Judiciary Committee and stated his view that courts probably would not impose liability on the government for discretionary actions, even if the act waiving sovereign immunity did not include a specific exception for such actions. *See Dalehite,* 346 U.S. at 27, 73 S.Ct. 956; *see also United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 810, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Apparently not content to rely on the courts to protect the government from unintended liability, Congress included an express discretionary function exception in the FTCA. The exception states that the FTCA's waiver of sovereign immunity does not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on

---

**3.** For example, the Limitation of Vessel Owner's Liability Act, 46 U.S.C.A.App. §§ 181–196, "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 446, 121 S.Ct. 993, 148 L.Ed.2d 931 (2001). The Carriage of Goods by Sea Act, 46 U.S.C.A.App. §§ 1300–1315, provides certain limitations on a carrier's liability for damage to cargo. *See, e.g., Universal Leaf Tobacco Co. v. Companhia De Navegacao Maritima Netumar,* 993 F.2d 414, 416–17 (4th Cir.1993).

the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.A. § 2680(a).

The FTCA excludes from its reach claims for which a remedy is provided by the SIAA or the PVA. *See* 28 U.S.C.A. § 2680(d). In 1946, when the FTCA was enacted, the SIAA and PVA waived sovereign immunity only in cases involving public or merchant vessels. Thus, admiralty tort actions not involving public or merchant vessels could be pursued against the government under the FTCA. *See United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 172, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976) (explaining that "[m]aritime tort claims deemed beyond the reach of [the SIAA and PVA] could be brought only on the law side of the district courts under the Federal Tort Claims Act"); *see also Somerset Seafood Co. v. United States*, 193 F.2d 631, 634 (4th Cir.1951) (concluding that certain maritime claims fell within the jurisdictional scope of the FTCA rather than the SIAA). Of course, any such actions under the FTCA would be subject to the limitations of that act, including the discretionary function exception.

During this time, the practice of maritime law proved to be exceedingly complex. The distinction between public vessels (subject to suit under the PVA) and merchant vessels (subject to suit under the SIAA) was elusive, and, beyond noting that the categories were mutually exclusive, courts had difficulty precisely articulating the difference between the types of vessels. *See Continental Tuna*, 425 U.S. at 172 n. 1, 96 S.Ct. 1319; *see also Blanco v. United States*, 775 F.2d 53, 57 n. 4 (2nd Cir.1985). To further complicate matters, the Tucker Act provided that general contract actions against the government fell either within the exclusive jurisdiction of the Court of Claims or the concurrent jurisdiction of the Court of Claims and the district court, depending on the amount in controversy. *See Blanco*, 775 F.2d at 57 n. 4. But once the SIAA was passed, most (but not all) maritime contract actions involving the government fell within the admiralty jurisdiction of the district courts and were not subject to the Tucker Act. *See Matson Navigation Co. v. United States*, 284 U.S. 352, 359–60, 52 S.Ct. 162, 76 L.Ed. 336 (1932) (holding that the Court of Claims lacked jurisdiction over a contract whose subject matter was covered by the Suits in Admiralty Act); *see also Continental Tuna*, 425 U.S. at 172, 96 S.Ct. 1319 (explaining that "contract claims not encompassed by [the PVA or the SIAA] fell within the Tucker Act, which lodged exclusive jurisdiction in the Court of Claims for claims exceeding $10,000"). If an admiralty practitioner guessed wrong and filed in the wrong court or under the wrong act, the consequences could be dire, because the statutes of limitations under the SIAA and the PVA were substantially shorter than that of the Tucker Act, and there was no procedure for transferring cases between the Court of Claims and the district courts. *See Continental Tuna*, 425 U.S. at 172–73, 96 S.Ct. 1319; *Blanco*, 775 F.2d at 57 n. 4.

Congress put an end to these problems in 1960. First, Congress authorized transfers between the Court of Claims and district courts for cases filed in the wrong court. *See* Pub.L. No. 86–770, §§ 1–2, 74 Stat. 912 (1960). In addition, Congress amended the SIAA by eliminating the reference to "merchant vessel." *See id.*, § 3, 74 Stat. 912 (1960). Thus, after the 1960 amendments, the SIAA authorized *in personam* admiralty actions against the United States "[i]n cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty

could be maintained." 46 U.S.C.A.App. § 742 (West Supp.2003). As is relevant to this case, the 1960 amendments worked no other substantive change to the SIAA. Specifically, no limitations on the waiver of sovereign immunity similar to those contained in the FTCA were added to the Act.

There is no indication in the legislative history that Congress intended the 1960 amendments to do anything other than correct the jurisdictional problems mentioned above. Nonetheless, courts have consistently concluded that the 1960 amendments greatly expanded the reach of the SIAA to include essentially all admiralty tort actions that could be asserted against the government. *See, e.g., Trautman v. Buck Steber, Inc.*, 693 F.2d 440, 444 (5th Cir.1982); *Bearce v. United States*, 614 F.2d 556, 558 (7th Cir.1980); *Kelly v. United States*, 531 F.2d 1144, 1148–49 (2nd Cir.1976); *Lane*, 529 F.2d at 179. Thus, after the 1960 amendments, admiralty actions that previously would have been brought under the FTCA instead had to be brought under the SIAA—both the SIAA and the FTCA make it clear that the SIAA provides the exclusive remedy for cases falling within its scope. *See* 46 U.S.C.A. § 745 ("[W]here a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter . . . ."); 28 U.S.C.A. § 2680(d) (excluding from the FTCA "[a]ny claim for which a remedy is provided by sections 741–752, 781–790 of Title 46, relating to claims or suits in admiralty against the United States").

After the 1960 amendments to the SIAA, questions began to arise as to whether the SIAA should be read to include an implied discretionary function exception. After all, the admiralty claims that had previously fallen under the FTCA had been subject to that act's discretionary function exception. If the SIAA did not include a discretionary function exception at least as to those claims that previously would have been brought under the FTCA, then the government would suddenly be exposed to liability in areas where it had been protected.

The argument that the SIAA included an implied discretionary function exception initially was not very well received. In *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir.1971), the Fifth Circuit concluded that a review of the language of the amended SIAA and its legislative history foreclosed the argument:

> It is true that the legislative history says nothing concerning a purpose to surrender immunity [as to claims previously within the scope of the FTCA]. It is equally true, though, that § 742 by its own terms disavows governmental immunity in admiralty actions against the United States. Had the sole purpose of the legislation been to clarify the confusing language of the old SIA this would have been better done by modifying the old § 742 to contain a clear definition of merchant, public, vessels and cargoes plus a delineation of contract claims growing out of Governmental shipping operations.
>
> More positively, the legislative history shows that almost on the eve of a probable enactment of a narrowly constructed solution to conflicts in jurisdiction between the Court of Claims and the District Courts, Congress . . . set out to solve the underlying problems by eliminating the historic restriction of SIA–PVA liability to non-contractual claims relating to ships or cargo. It was to assimilate the Government to the private person in relation to any or all transactions giving rise to liability in the Admiralty. It would be incongruous to impute to Congress a purpose to perpetrate confusion, not by reason of choos-

ing the wrong forum, but by importing substantive standards of liability and governmental defenses by a retrospective analysis of what would have been the case prior to 1960. Reimportation of FTCA provisions or exceptions produces obviously unintended and irrational distinctions.

*Id.* at 145–46 (footnotes omitted). This court in *Lane* likewise rejected the argument:

[The SIAA] contains no discretionary function exception, and the Tort Claims Act contains a specific exception of claims for which the Suits in Admiralty Act provides a remedy. Thus it is clear that this action could not have been brought under the Tort Claims Act, and it is properly maintainable under the Suits in Admiralty Act, which is an effective waiver of sovereign immunity.

There is no basis upon which we can import the many exceptions in the Tort Claims Act into the Suits in Admiralty Act, where the United States is to be held accountable in admiralty whenever a private person, in similar circumstances, would be.

*Lane*, 529 F.2d at 179 (footnotes omitted).

Shortly after *Lane* was decided, however, the tide turned, and courts began accepting the argument that the post–1960 SIAA included an implied discretionary function exception. Coincidentally, the First Circuit was the first circuit to explicitly so conclude. *See Gercey v. United States*, 540 F.2d 536, 539 (1st Cir.1976). After *Gercey*, every circuit to consider the question likewise concluded that an implied discretionary function exception should be read in the SIAA. *See Tew v. United States*, 86 F.3d 1003, 1005 (10th Cir.1996); *Earles v. United States*, 935

F.2d 1028, 1032 (9th Cir.1991) ; *Sea–Land Serv., Inc. v. United States*, 919 F.2d 888, 893 (3d Cir.1990); *Robinson v. United States (In re Joint E. & S. Dists. Asbestos Litig.)*, 891 F.2d 31, 34–35 (2d Cir.1989); *Williams v. United States*, 747 F.2d 700 (11th Cir.1984) (per curiam), *aff'g Williams ex rel. Sharpley v. United States*, 581 F.Supp. 847 (S.D.Ga.1983); *Gemp v. United States*, 684 F.2d 404, 408 (6th Cir.1982); *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1085 (D.C.Cir.1980); *Bearce v. United States*, 614 F.2d 556, 560 (7th Cir.1980). Even the Fifth Circuit, describing the discussion of the issue in *De Bardeleben* as non-binding dictum, has concluded that the SIAA includes a discretionary function exception. *See Wiggins v. United States*, 799 F.2d 962, 964–66 (5th Cir.1986).

The question, then, is whether this court should overrule *Lane*, and as a consequence join the other circuits in concluding that the SIAA contains an implied discretionary function exception. For reasons that we will explain below, we conclude that the SIAA's waiver of sovereign immunity should be read to include an implied discretionary function exception to that waiver. Accordingly, we hereby overrule *Lane* to the extent that it concludes the SIAA does not include an implied discretionary function exception.[4]

## IV.

In support of its view that the SIAA includes an implied discretionary function exception, the government makes two primary arguments. First, the government contends that Congress did not intend to waive immunity under the SIAA for discretionary actions, and that this court,

4. Because the only portion of *Lane* that is relevant to this *en banc* hearing is the portion addressing the discretionary function excep-

tion, we overrule *Lane* only as to that issue. *Lane*'s disposition of the other issues in that case is unaffected by our decision today.

therefore, should not interpret the SIAA in a manner inconsistent with Congressional intent. Second, the government contends that principles of separation-of-powers require us to exclude discretionary actions from the SIAA's waiver of sovereign immunity. We consider these arguments in turn.

### A.

First, we consider the government's argument that we must give effect to what the government contends is a clear Congressional intent to exclude discretionary acts from the SIAA's waiver of sovereign immunity.

The Supreme Court has repeatedly explained that the plain language of a statute is the best evidence of Congressional intent. *See, e.g., Holloway v. United States,* 526 U.S. 1, 6, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999). As noted above, the SIAA includes no list of exceptions to its waiver of sovereign immunity, but instead provides only that the government is entitled to the limitations of liability that are available in admiralty to private defendants. Thus, the plain language of the SIAA seems to reflect a Congressional intent that discretionary acts should *not* be excluded from the waiver of sovereign immunity. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (explaining that when construing a statute, "[t]he first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (citations and internal quotation marks omitted)).

The government, however, makes the rather remarkable argument that the legislative history of the *FTCA* supports its view of what Congress intended when it amended the *SIAA* nearly twenty years later. According to the government, the legislative history of the FTCA shows that Congress believed that the courts would not hold the government liable for discretionary acts whether or not the FTCA included an express exception for such actions. *See Varig,* 467 U.S. at 810, 104 S.Ct. 2755; *Dalehite,* 346 U.S. at 27, 73 S.Ct. 956. Accordingly, the government suggests that there was no reason for Congress to include a discretionary function exception when it amended the SIAA in 1960, because Congress assumed that courts would imply such an exception.

This is a difficult argument to accept. First of all, we fail to see how a 1942 legal opinion of an assistant attorney general as to the probability that courts would carve out discretionary acts from a waiver of sovereign immunity is indicative of what Congress did or did not intend some twenty years later. But more importantly, Congress in fact included a discretionary function exception in the FTCA even in the face of a legal opinion that the exception was not necessary. Thus, the discretionary function exception was important enough to Congress in 1946 that Congress included an express exception in the FTCA, to resolve any doubt about whether courts would create such an exception on their own. If the exception remained as important to Congress in 1960 when it amended the SIAA as it was when the FTCA was enacted, then it stands to reason that Congress would have written the exception into the SIAA then, particularly since the 1960 SIAA amendments transferred jurisdiction over a number of claims from the FTCA to the SIAA. *Cf., e.g., Binder v. Long Island Lighting Co.,* 933 F.2d 187, 193 (2nd Cir.1991) ("Congress enacted the ADEA in the wake of Title VII, and we believe that any omission in the text of the ADEA of a provision found

in Title VII is likely to reflect a deliberate decision on Congress's part.").

■ Likewise, resort to familiar canons of statutory construction fails to support the interpretation urged by the government. For example, it is well established that waivers of sovereign immunity "must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (citation, internal quotation marks, and alterations omitted); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) ("Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity.... The terms of consent to be sued may not be inferred, but must be unequivocally expressed." (internal quotation marks omitted)). The waiver of sovereign immunity contained within the SIAA, however, is clear and unequivocal, providing that an *in personam* admiralty action may be brought against the government if such an action could be maintained against a private person. Contrary to the government's suggestion, we simply cannot create an ambiguity in the *SIAA* by looking to the language and structure of the *FTCA*. *Cf. Lamie v. United States Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) (rejecting argument that statute was ambiguous based on assumption that Congress intended an amended statute to reflect the parallelism of a prior version of the statute: "One determines ambiguity, under this contention, by relying on the grammatical soundness of the prior statute. That contention is wrong. The starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes." (citation omitted)).

Moreover, even if the maxim requiring narrow construction of waivers of sovereign immunity were applicable, the result urged by the government runs contrary to another maxim of statutory construction which cautions that courts cannot "assume the authority to narrow the waiver that Congress intended." *Smith v. United States*, 507 U.S. 197, 203, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993); *accord Rayonier Inc. v. United States*, 352 U.S. 315, 320, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) ("There is no justification for this Court to read exemptions into the [FTCA] beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it.").

Accordingly, we cannot conclude that Congress clearly intended for the SIAA's waiver of sovereign immunity to be subject to an exception for discretionary functions, nor can we reach that conclusion by resort to traditional tools of statutory construction. But as we will explain below, we reach that very result by consideration and application of separation-of-powers principles.

### B.

"Even before the birth of this country, separation of powers was known to be a defense against tyranny." *Loving v. United States*, 517 U.S. 748, 756, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (citing Montesquieu, *The Spirit of the Laws* 151–152 (T. Nugent transl. 1949); 1 W. Blackstone, *Commentaries* \*146–\*147, \*269–\*270). Thus,

> [t]he Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within

each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

The "concept of separation of powers," then, is exemplified by "the very structure of the Constitution." · Miller v. French, 530 U.S. 327, 341, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (internal quotation marks omitted). "The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." Buckley v. Valeo, 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). "While the boundaries between the three branches are not 'hermetically' sealed, the Constitution prohibits one branch from encroaching on the central prerogatives of another." Miller, 530 U.S. at 341, 120 S.Ct. 2246 (citation and internal quotation marks omitted).

Accordingly, the Supreme Court has "not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." Mistretta v. United States, 488 U.S. 361, 382, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). With regard to the Executive Branch, separation-of-powers concerns are focused "on the extent to which [a statute] prevents the Executive Branch from accomplishing its constitutionally assigned functions." Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). In cases involving the Judicial Branch, the Court has traditionally acted to ensure "that the Judicial Branch neither be assigned nor allowed tasks that are more properly accomplished by other branches," and "that no provision of law impermissibly threatens the institutional integrity of the Judicial Branch." Mistretta, 488 U.S. at 383, 109 S.Ct. 647 (citation, internal quotation marks and alteration omitted). "Even when a branch does not arrogate power to itself, ... the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." Loving, 517 U.S. at 757, 116 S.Ct. 1737.

The Supreme Court has made clear that the discretionary function exception contained in the FTCA is grounded in separation-of-powers concerns. As the Court has explained, the exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." Varig Airlines, 467 U.S. at 808, 104 S.Ct. 2755. Although Varig does not use the phrase "separation of powers," the Court's explanation of the purpose behind the exception makes it clear that the exception is a statutory embodiment of separation-of-powers concerns:

> Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took steps to· protect the Government from liability that would seriously handicap efficient government operations.

Id. at 814, 104 S.Ct. 2755 (internal quotation marks omitted); see also Payton v. United States, 636 F.2d 132, 143 (5th Cir. 1981) ("The crux of the concept embodied in the discretionary function exception is that of the separation of powers."); Allen

*v. United States,* 527 F.Supp. 476, 485 (D.Utah 1981) ("[T]he words 'discretionary function' as used in the Tort Claims Act are really the correlative, the other side of the coin, of the exercise of executive power.").

When the purpose of the discretionary function exception in the FTCA is considered, it becomes apparent that the absence of such an exception in the SIAA is problematic, to say the least. For example, without a discretionary function exception, the government could be held liable for an initial decision to build a dam across a particular navigable waterway or to otherwise change the course of a navigable waterway. *See Coates v. United States,* 181 F.2d 816, 817 (8th Cir.1950) (concluding that plaintiffs' claim for damage to property caused by the government's decision to change the course of the Missouri River was barred by the discretionary function exception). The government could be held liable for the Coast Guard's drug-interdiction activities. *See Mid–South Holding Co. v. United States,* 225 F.3d 1201, 1206–07 (11th Cir.2000) (concluding that discretionary function exception precluded claim against government for damages to a private vessel that occurred during Coast Guard's search for drugs). The government could perhaps even be held liable for an inaccurate weather forecast. *See Brown v. United States,* 790 F.2d 199, 203–04 (1st Cir.1986) (concluding that discretionary function exception barred negligence claims brought by relatives of fishermen who drowned during a storm that the National Oceanic and Atmospheric Administration failed to predict).

As these examples illustrate, if the SIAA does not include a discretionary function exception, the executive branch's ability to "faithfully execute[ ]" the law, U.S. Const., art. II § 3, would be substantially im-

paired. As the Second Circuit has explained,

> The wellspring of the discretionary function exception is the doctrine of separation of powers. Simply stated, principles of separation of powers mandate that the judiciary refrain from deciding questions consigned to the concurrent branches of the government....
>
> The doctrine of separation of powers is a doctrine to which the courts must adhere even in the absence of an explicit statutory command. Were we to find the discretionary function exception not to be applicable to the SAA, we would subject all administrative and legislative decisions concerning the public interest in maritime matters to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries. Such an outcome is intolerable under our constitutional system of separation of powers.

*In re Asbestos Litig.,* 891 F.2d at 35 (citations and internal quotation marks omitted); *see also Tiffany,* 931 F.2d at 276 ("It is plain that the discretionary function exception to tort liability serves separation of powers principles by preventing judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." (alteration and internal quotation marks omitted)).

Moreover, if all executive-branch actions taking place in the maritime arena were subject to judicial review, the judiciary would be called upon to decide issues it is not equipped to resolve. We do not mean to suggest, of course, that judicial review is not the core responsibility of the judiciary, or that judicial review of all executive actions would impair the executive's obligation to faithfully execute the laws. But where the executive's discretionary func-

tions are at issue, interference from the judicial branch is inappropriate. The discretionary function exception

> articulate[s] a policy of preventing tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of government.... Statutes, regulations, and discretionary functions, the subject matter of § 2680(a), are, as a rule, manifestations of policy judgments made by the political branches. In our tripartite governmental structure, the courts generally have no substantive part to play in such decisions. Rather the judiciary confines itself ... to adjudication of facts based on discernible objective standards of law. In the context of tort actions, ... these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.

*Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Pa.1978) (Becker, J.) (footnote omitted).

Because our structural separation of powers is "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of another," *Buckley,* 424 U.S. at 122, 96 S.Ct. 612, we must read the SIAA in a way that is consistent with those principles. *See Limar Shipping, Ltd. v. United States,* 324 F.3d 1, 7 (1st Cir.2003) (applying discretionary function exception to SIAA and explaining that the "[a]bsence of an express Congressional directive to the contrary will not be read as a green light for federal courts to assume power to review all administrative and legislative decisions concerning the public interest in maritime matters") (internal quotation marks omitted); *Sea–Land Serv.,* 919 F.2d at 891 ("We understand *Varig* to teach that, as a matter of judicial construction, we should not read a general waiver of sovereign immunity to include a waiver of immunity with respect to damage occasioned by policy decisions. Accordingly, we hold that the SAA, which explicitly contains only a general waiver, also implicitly contains a discretionary function exception to its waiver of sovereign immunity."); *In re Joint Asbestos Litig.,* 891 F.2d at 35 ("[W]e find the SAA to be subject to the discretionary function exception. This result is compelled by our steadfast refusal to assume powers that are vested in the concurrent branches."); *Canadian Transport Co. v. United States,* 663 F.2d 1081, 1086 (D.C.Cir.1980) (explaining that the discretionary function exception is "derived from the doctrine of separation of powers, a doctrine to which the courts must adhere even in the absence of an explicit statutory command.... Our recognition of a discretionary function exception in the Suits in Admiralty Act, therefore, is not an attempt to rewrite the statute, but merely an acknowledgment of the limits of judicial power."). Accordingly, like the other circuits to have considered the question, we now conclude that separation-of-powers principles require us to read into the SIAA's waiver of sovereign immunity a discretionary function exception.[5]

---

**5.** By our decision today, we do not mean to suggest that all waivers of sovereign immunity must be subject to either an express or implied discretionary function exception. We do not doubt that Congress could enact a statutory framework so specific in its detail that the Executive branch would have no discretion when executing that law and that such a statute would pass constitutional muster. Governmental liability under such a scheme

We pause to note, however, that this conclusion is not as obvious as the cursory analysis of some opinions from other circuits might suggest. We have just explained our belief that the discretionary function exception embodies separation-of-powers principles that are important enough to require courts to apply a discretionary function exception to statutes that are silent on the issue. Under that analysis, then, one would expect to find cases from the early days of the SIAA and PVA where the courts refused to impose liability on the government for its conduct of discretionary functions. After all, judicial recognition of the inherent constraints of our constitutional structure is hardly new. The early case law, however, is more equivocal on this score than might be expected.

Certainly there are some early cases where courts using separation-of-powers-like language have questioned the wisdom of holding the government liable for the actions at issue in those cases. For example, in *Mandel v. United States,* 191 F.2d 164 (3rd Cir.1951), *aff'd sub nom. Johansen v. United States,* 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051 (1952), the court considered a claim filed under the PVA by the estate of a civilian employee killed when the vessel to which he was assigned hit a mine in an Italian port during World War II. After concluding that the estate's sole remedy was under the Federal Employees Compensation Act, *see id.* at 166, the court stated that

> it would not be in the public interest to have judicial review of the question of negligence in the conduct of military, or semi-military, operations. The operation of ships or land forces in the presence of the enemy is a matter where judgments frequently have to be made quickly and where judgments so made by commanding officers must have prompt and immediate response. It will not, we think, aid in the operation of the armed forces if the propriety of a commander's judgment is to be tested months or years afterwards by a court or a court and jury. What, in the light of subsequent events, may appear to be a lack of caution may have been the very thing necessary, or apparently necessary, at the time the action was taken.
> . . .
> . . . . No judge has it as part of his task to act as an intelligence officer for the armed forces. He cannot tell how the facts developed out of one incident, seemingly isolated and unimportant, may fit into a larger picture worked upon by an active and skilled hostile

---

clearly would not include a discretionary function exception, because the Executive branch was in fact not vested with discretion. *Cf. Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) ("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect."). But the ability to withhold discretion in the first instance does not necessarily mean that Con-gress may undermine discretion affirmatively granted to the Executive branch through the imposition of boundless tort liability. That is to say that in areas where Congress has vested the Executive with discretion, we are not as certain that Congress could waive sovereign immunity and expressly provide that no exception to the waiver of immunity shall be made for the Executive's performance of discretionary acts. In our view, such a statute might be subject to a constitutional challenge on separation-of-powers grounds. Because the SIAA is silent on the question of a discretionary function exception, we need not and do not consider whether such a withdrawal of immunity would be constitutional.

espionage system. We do not think he should be called upon to pass upon such a question.

*Id.* at 167, 168.

The Third Circuit articulated a similar analysis in *P. Dougherty Co. v. United States,* 207 F.2d 626 (3rd Cir.1953) (en banc). In *Dougherty,* a private barge was damaged in a collision, and a Coast Guard cutter was sent to tow the barge to a harbor. Problems arose as the cutter approached the harbor with the barge in tow, and the cutter was eventually forced to cut the towing hawser. Adrift, the barge pounded against a breakwater for almost an hour and suffered substantial damage. The Third Circuit determined, for several reasons, that while the Coast Guard was negligent, that negligence did not give rise to liability on the part of the government. The court went on to say that public policy prevents the government from being held liable under the PVA "for fault of the Coast Guard in the conduct of a rescue operation at sea." *Id.* at 634. The court explained:

There are two arrows in the quiver of this public policy. The first may be directed to the inevitable consequence on the morale and effectiveness of the Coast Guard if the conduct of its officers and personnel in the field of rescue operations under the indescribable strains, hazards and crises which attend them, is to be scrutinized, weighed in delicate balance and adjudicated by Monday-morning judicial quarterbacks functioning in an atmosphere of Serenity and deliberation far from the madding crowd of tensions, immediacy and compulsions which confront the doers and not the reviewers.

.... A judicial determination that officers or men of the Coast Guard have

been negligent in rescue operations would inevitably have a concomitant effect upon their service records. Aware of that fact, the instinct of self-preservation would inevitably function even under the pressures of life or death crises which so often arise in rescue operations when members of the Coast Guard are called upon to make decisions. If men are to be brought to an abrupt halt in the midst of crisis—to think first that if they err in their performance they may expose their Government to financial loss and themselves to disciplinary measures or loss of existing status, and then to pause and deliberate and weigh the chances of success or failure in alternate rescue procedures, the delay may often prove fatal to the distressed who urgently require their immediate aid. Thus would the point of the second arrow in the quiver of public policy be blunted the arrow which is directed to preserve in the public interest our merchant marine and that of other nations with which we trade.

History establishes that tragic losses in men and ships all too frequently attend disasters at sea, and too often is it impossible to give successful succor despite the most gallant and efficient of efforts. To expose the men in the Coast Guard to the double jeopardy of possible loss of their own lives, and loss of status in their chosen careers, because they failed, in coping with the intrinsic perils of navigation, to select the most desirable of available procedures, or their skill was not equal to the occasion, is unthinkable and against the public interest.

*Id.* at 634–35 (footnotes omitted).

Thus, both *Mandel* and *Dougherty* seem to apply what amounts to a discretionary

function exception.[6] However, there is little indication in these opinions that the courts were considering the broader question of whether it is ever appropriate for a court to hold the government liable for its discretionary functions.

On the other hand, there are cases decided under the pre–1960 SIAA or PVA where the government's potential liability was determined by a straightforward application of common law principles, without mention of a discretionary function exception, even though the circumstances of the cases would seem to at least warrant a discussion of the possibility of such an exception. For example, in *McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), the Supreme Court concluded that the government was liable under the SIAA to a seaman who contracted polio while serving on a ship located in Chinese waters in the fall of 1945, shortly after the World–War–II surrender of Japan. The government knew that polio was then prevalent in Shanghai, and the Court concluded that the government's decision to allow Chinese soldiers and stevedores from Shanghai "to have the run of the ship and use of its facilities" supported the district court's determination that the government was negligent. *Id.* at 21, 75 S.Ct. 6. There was no consideration of the possibility that the government's actions might fall within a discretionary function exception to the SIAA's waiver of sovereign immunity.

Likewise, in *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945), the crew of a Navy patrol boat during World War II instructed a private vessel that the patrol boat would escort it into the Delaware Bay. As the private vessel followed the patrol boat directly astern, as ordered by the Navy crew, the private vessel struck a submerged wreck and was damaged. The owner of the private vessel sued the government under the PVA, arguing that the collision was caused by the negligence of the Navy crew. The issue before the Supreme Court was whether the PVA extended to claims where the damage was caused by the crew of a public vessel rather than by the public vessel itself. The Supreme Court concluded that the PVA did extend to such claims, and the Court therefore vacated the decision of the appellate court and remanded for further proceedings. *See id.* at 224–25, 65 S.Ct. 639. The factual setting of *Canadian Aviator*— the actions of a Navy patrol boat during war—would seem to make the case a good candidate for consideration of a discretionary function exception. But there is no indication in the opinions of the district court, the court of appeals, or the Supreme Court that the possibility of such an exception was ever suggested by the government or considered by the courts.

Likewise, there are several older circuit-court cases where the factual setting would seem to warrant consideration of a discretionary function exception, yet the opinions are silent in that regard. *See United States v. The S.S. Washington*, 241 F.2d 819, 821 (4th Cir.1957) (concluding that government and private vessel were both at fault for collision between private vessel and Navy destroyer that was returning to its position in a flotilla of Navy vessels after completing a mission to pick up soldiers; possibility of a discretionary function exception was not discussed); *Pacific–Atlantic S.S. Co. v. United States*, 175

---

**6.** Although the Supreme Court affirmed *Mandel,* the Court considered only whether the Federal Employees Compensation Act provided the exclusive remedy; the Court did not address the Third Circuit's discretionary function analysis. *See Johansen,* 343 U.S. at 431–41, 72 S.Ct. 849.

F.2d 632 (4th Cir.1949) (concluding that government was not at fault in collision between private vessel and Navy battleship which, "[d]ue to war conditions," was zig-zagging and operating without lights; court did not consider the possibility of a discretionary function exception); *United States v. The Australia Star*, 172 F.2d 472, 476 (2nd Cir.1949) (concluding that, with regard to 1944 collision between the S.S. Hindoo and the S.S. Australian Star, the United States naval vessel that was escorting the Hindoo was partially responsible for the collision; no discussion of a possible discretionary function exception even though duty of commander of Navy escort was "to do what ... would safeguard the Hindoo" and the commander "had authority to give an emergency war time order to any Allied merchant vessel").

The ambiguity of the pre–1960 cases with regard to a broad discretionary function exception to the SIAA or PVA could indicate that, at least in the view of early courts, the exception was not warranted in maritime cases. But since some admiralty actions were cognizable under the FTCA before the 1960 SIAA amendments, it is clear that a discretionary function exception is not *per se* inappropriate or unwarranted in the maritime arena. Alternatively, the relative silence of the pre–1960 cases with regard to a discretionary function exception under the SIAA or PVA could indicate that there is something about those particular claims that warrants different treatment. That is, it could be that the nature of claims that were never cognizable under the FTCA and have always been cognizable only under the SIAA or the PVA is such that it would rarely be appropriate to apply a discretionary function exception as to those cases. If that were the case, then perhaps the discretionary function exception that we believe must be read into the SIAA should be limited to those claims that, before the

1960 amendments, were cognizable only under the FTCA. Claims that could have been brought under the SIAA before it was amended would not be subject to the exception.

We cannot, however, conceive of a difference in the nature of the claims that were cognizable under the FTCA and those that were cognizable only under the SIAA or the PVA that is substantial enough to warrant such a result. Broadly speaking, the PVA and pre–1960 SIAA applied to claims involving government vessels, public or merchant. Thus, the cases that were cognizable under the FTCA were those cases where the injury was not caused by a government vessel or its crew yet still fell within the admiralty jurisdiction of the federal courts. If anything, it seems that cases involving public or merchant vessels are more likely to involve the executive's discretionary functions into which the judiciary should not intrude.

More importantly, however, any such limitation on the application of the discretionary function exception would give too much effect to the ambiguity of pre–1960 case law. While it may be that the preamendments courts did not consider the possibility of some form of a discretionary function exception because such an exception was not viewed as appropriate, the failure to address the issue could just as easily be attributed to some other factor—for example, the government's failure to press the issue. In any event, we do not believe that we can subordinate compelling separation-of-powers concerns to the ambiguous silence of the early SIAA and PVA cases. Accordingly, we conclude that a discretionary function exception applies to all cases brought under the SIAA, without regard to whether the claims, prior to the

1960 amendments, would have been brought under the FTCA or the SIAA.[7]

■ We now turn to one final point with regard to the scope of the SIAA's discretionary function exception. At oral argument, counsel for the plaintiffs suggested that the exception as it has developed under the FTCA has strayed beyond that which is required by separation-of-powers principles. That is, counsel contends that courts have applied the exception to exonerate the government from cases where an imposition of liability would not have been inconsistent with separation-of-powers principles. Thus, counsel argues that this court should not read into the SIAA an exception that is co-extensive with the exception as applied under the FTCA, but that we should instead hold that the SIAA is subject to a discretionary function exception only and to the precise extent necessary to serve the principles of separation of powers. If imposition of liability in any given case would not be offensive to separation-of-powers principles, then the government's conduct should not be excused, even if case law developed under the FTCA would characterize the government's action as falling within the discretionary function exception.[8]

---

7. When taking issue with our conclusion in this regard, our dissenting colleague Judge Luttig fails to acknowledge that our resolution of this issue is the same as that of every circuit to have considered the issue—ten other circuits at last count. It is of course possible that everyone else is wrong and our dissenting colleague is right, but we take some comfort in the fact that Congress has made no effort to override this view. We are well aware of the "danger of placing undue reliance on the concept of congressional 'ratification,'" *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n. 1, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), that is, of concluding that congressional failure to amend a statute in response to a line of cases amounts to congressional approval of the line of cases. Nonetheless, we note that the first case to explicitly apply the discretionary function exception to actions under the SIAA was decided in 1976, *see Gercey v. United States*, 540 F.2d 536 (1st Cir.1976), the separation-of-powers rationale for applying the discretionary function exception to cases under the SIAA was clearly articulated by at least 1980, *see Canadian Transp. Co. v. United States*, 663 F.2d 1081 (D.C.Cir.1980), and the courts have spoken in a strong and (now) unified voice since then. If import can ever be attached to congressional inaction, we think it would be in this case. If our approach were as misguided as the dissent believes it to be, it seems likely that Congress would have taken some action by now. *Cf. Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 73, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (noting swift congressional action to correct what Congress perceived to be an "unacceptable decision" interpreting Title IX).

8. We understand Judge Luttig in his dissent to harbor a similar concern. According to the dissent, application of the political question doctrine would be sufficient to resolve any separation-of-powers questions that might arise in any given case under the SIAA. Our colleague believes that by adopting a discretionary function exception to the SIAA we have unwisely jettisoned the "cautious case-by-case analysis" required under the political question doctrine, *infra* at 382, in favor of an overinclusive categorical exception. We note, however, that determining whether the facts of a case fit within the scope of the discretionary function exception itself involves a cautious case-by-case analysis. *See, e.g., Shansky v. United States*, 164 F.3d 688, 692–93 (1st Cir.1999) ("We do not suggest that any conceivable policy justification will suffice to prime the discretionary function pump.... [T]he determination as to where one draws the line between a justification that is too far removed, or too ethereal, or both, and one that is not, is case-specific, and not subject to resolution by the application of mathematically precise formulae."). We recognize that applying a discretionary function exception to claims under SIAA may well result in the exoneration of the government more frequently than would application of the political question doctrine. Nonetheless, given our view (one with which the dissent strongly disagrees) that the discretionary function exception reflects fundamental separation-of-powers principles, we do not believe that the

At bottom, counsel's argument reflects a concern that the discretionary function exception has been applied too broadly under the FTCA and that it will likewise be applied too broadly under the SIAA. While it may be that courts have in some instances applied the FTCA's discretionary function exception more broadly than Congress intended or than might be strictly required under separation-of-powers principles, these occasional judicial errors do not warrant a wholesale retreat from a body of law that has been developed and refined over the course of almost fifty years. As we have explained, separation-of-powers principles require us to read a discretionary function exception into the SIAA, and it was those same separation-of-powers concerns that drove Congress to create the discretionary function exception to the FTCA. *See Varig Airlines,* 467 U.S. at 808, 104 S.Ct. 2755 (explaining that the discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals"). In our view, the discretionary function exception as it has been developed and applied under the FTCA is the best embodiment of those separation-of-powers concerns, and we believe that it is therefore appropriate for FTCA cases to guide the application of the exception under the SIAA.

## V.

To summarize, we adhere to the rule previously applied in this circuit that requires a panel of this court faced with conflicting panel opinions to follow the ear-

lier case. On the merits of the issue raised by the government, we conclude that, although the statute is silent on the issue, the SIAA must be read to include a discretionary function exception to its waiver of sovereign immunity. We hereby overrule *Lane v. United States,* 529 F.2d 175 (4th Cir.1975), to the extent that it concluded that a discretionary function exception does not apply to cases brought under the SIAA. Because the discretionary function exception under the FTCA and the exception that we apply today to the SIAA are both grounded in concerns of separation of powers, the scope of the discretionary function exception under the SIAA should mirror that of the FTCA, and discretionary function cases decided under the FTCA should guide decisions under the SIAA. The district court in this case concluded as a legal matter that a discretionary function exception was not available to the government in this case, and the court therefore did not consider whether the facts of the case warranted application of such an exception. Accordingly, we vacate the order of the district court and remand to give the district court the opportunity to decide in the first instance whether the discretionary function exception we recognize today precludes the plaintiffs' claims and to conduct any other proceedings that might become necessary.[9]

*VACATED AND REMANDED*

WILKINSON, Circuit Judge, concurring:

I am happy to concur in Judge Traxler's fine opinion in this case. The court holds today that the Suits in Admiralty Act (SIAA), 46 U.S.C.A. §§ 741–52 (West 1975

---

possibility of fewer prevailing plaintiffs warrants a different conclusion.

9. Because we vacated the panel opinion upon the granting of the government's petition for

rehearing *en banc,* the panel opinion's discussion of the duty-to-warn question is no longer binding authority. The district court is free to consider the duty-to-warn issue *de novo,* should it arise again on remand.

& Supp.2003), is subject to an exception similar to the discretionary function exception embodied in the Federal Tort Claims Act (FTCA), 28 U.S.C.A. §§ 2671–80 (West 1994 & Supp.2003). I write simply to state my view that any different result would not be supportable.

Tort liability will certainly lie against the United States under the SIAA. After all, that is the point of any waiver of immunity in the first place. It may well be that the discretionary function exception is inapplicable on the facts of this case. But appellants ask us to go much, much farther—to indulge in effect the broadest possible waiver of sovereign immunity for the performance of every discretionary governmental function and to disregard the principle that such waivers of immunity must be narrowly construed. *See Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *United States Dep't of Energy v. Ohio,* 503 U.S. 607, 615, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992); *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951). When we address the scope of a sovereign immunity waiver, the Supreme Court requires us to take a cautious approach, not a sweeping and momentous one.

The majority's action is not one of impermissible judicial implication. There is nothing implicit about the separation-of-powers concerns that underlie the discretionary function exception, concerns that we are obliged to honor even in the absence of a statutory directive. *See, e.g., Robinson v. United States (In re Joint E.*

& S. Dists. Asbestos Litig.),* 891 F.2d 31, 35 (2d Cir.1989); *Canadian Transport Co. v. United States,* 663 F.2d 1081, 1086 (D.C.Cir.1980). The executive has an explicit, not an implicit, duty to see that the laws are faithfully executed. *See* U.S. Const. art. II, § 3. This duty cannot be discharged without the exercise of some discretion. For the court to subject every such discretionary act to the prospect of tort liability would not only be to undercut an explicit constitutional command; it would wrongly assign to Congress the desire to debilitate the executive branch. The discretionary function exception is thus implied only in the same sense that the doctrine of qualified immunity is implied in the interpretation of 42 U.S.C. § 1983—on the premise that without the ability to exercise some element of judgment in the execution of law, neither federal, state, nor local government could function.[1]

The language that this court applies today is not language that the judiciary has somehow made up on its own. Rather, the Court adopts Congress's own explicit expression of separation-of-powers principles in 28 U.S.C. § 2680(a). *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (recognizing that FTCA's discretionary function exception was Congress's attempt "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy"). The fact that we have at hand

---

**1.** Of course, qualified immunity is an example of "reading into" a statute a degree of immunity in order to satisfy, among other things, separation-of-powers concerns. The dissent (references are to my brother Luttig's dissent) contends that SIAA suits will pose no problem so long as personal liability to the executive actor does not attach. *See dissenting op.* at 367–68 n.4. To the contrary, protracted litigation imposes enormous costs if applied to the discharge of the innumerable policy-laden matters assigned by Congress to the executive branch. My dissenting colleagues appear to suggest that separation-of-powers principles are never implicated unless a coordinate branch of government is all but immobilized—a reading of separation-of-powers I respectfully reject.

such a carefully crafted expression of separation-of-powers principles from a coordinate branch of government rebuts any suggestion that the court is somehow on a statutory frolic of its own.

The dissent attempts to say that *Varig Airlines,* and by extension the discretionary function exception itself, is not an expression of separation-of-powers principles. *See dissenting op.* at 370. Even in our modern age, however, some things are indeed what they seem. The discretionary function exception expresses Congress' view of that degree of "separation" required by the executive branch to carry out its duties. It further underscores the need for judicial forbearance in the face of policy-laden decisions made by the coordinate branches of our government. These are classic separation-of-powers concerns. Not surprisingly, then, our court and our sister circuits have interpreted *Varig Airlines* to embody separation-of-powers principles. *See, e.g., Tiffany v. United States,* 931 F.2d 271, 276 (4th Cir.1991); *Irving v. United States,* 162 F.3d 154, 160 n. 4 (1st Cir.1998); *In re Joint E. & S. Dists. Asbestos Litig.,* 891 F.2d at 35; *Wiggins v. United States,* 799 F.2d 962, 965–66 (5th Cir.1986).

The majority's action thus heeds not only the executive's constitutional prerogatives, but Congress's respect for those prerogatives as well. It is difficult to imagine that Congress was seeking to eliminate executive branch discretion in the execution of what are, after all, Congress's own policy mandates and directives. *See Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (finding that discretionary function exception protects "governmental actions and decisions based on considerations of public policy"). A failure to recognize *any* discretionary function would allow the deterrent effect of tort liability in those very

areas where Congress has mandated an active executive role. Shorn of a discretionary function exception, the executive branch would be profoundly impaired in carrying out the very functions that Congress has assigned to it.

Nor is it easy to imagine that the SIAA somehow sought to disable the executive branch from invoking separation-of-powers principles via its discretionary functions as a defense to unlimited tort liability. Without the defense, the United States would be subject not only to constitutional constraints, but under the SIAA to tort duties and negligence actions, for attempts to enforce immigration law; to intercept narcotics-smuggling; to protect its airspace from hostile, incoming aircraft; and to safeguard its harbors from biological agents in container cargo. "Were there no such immunity for basic policy making decisions, all administrative and legislative decisions concerning the public interest in maritime matters would be subject to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries." *Gercey v. United States,* 540 F.2d 536, 539 (1st Cir.1976).

The dissent speaks so derisively of the discretionary function exception that perhaps it would find no impediment to judicial consideration of the countless policy judgments attendant to armed warfare at sea. After all, ascertainable standards for the resolution of such questions may well exist. *See dissenting op.* at 372–73. In *In re Joint E. & S. Dists. Asbestos Litig.,* the Second Circuit in 1989 faced a challenge under the SIAA to President Roosevelt's use of asbestos in the construction of ships for the merchant marine in World War II. 891 F.2d at 33–34. Dismissing the suit under the discretionary function exception, the court noted:

The fact that the challenged actions were matters of choice cannot be overcome by clothing the discretionary acts in the maritime uniform of a breach of a duty to provide a seaworthy vessel. We are unwilling to declare that during a world war, when ships were being sunk by the enemy as fast as they could be constructed, it was impermissible for the government to choose to deploy ships in less than seaworthy condition. We need spend little time discussing whether the contested choices involved considerations of public policy. It is difficult to imagine a clearer example of a decision grounded in social, economic, and political policy than the choice of how to prosecute a world war.

*Id.* at 37 (internal quotations and citation omitted).

Toward the end of his opinion, my dissenting colleague attempts to crawl back from the far limb. "I agree," he says, "that the SIAA may well authorize some suits that call upon the courts to make political judgments that they are neither prepared to make, nor capable of competently making." *Dissenting op.* at 373. But while the dissent professes to recognize the same concerns as the majority, its answer is to jettison congressional language tailored to this very context—governmental tort liability—in favor of the all-purposive political question doctrine. The dissent thus commits, in even more serious fashion, the same sin that it seeks to ascribe to the majority. It concedes that a blanket waiver of immunity would run headlong into a constitutional problem, but it refuses to respect Congress's solution to that problem. The dissent's substitution of a judicially-derived doctrine for congressionally-crafted language makes for a truly anomalous statutory scheme: executive officials could be liable for discretionary functions, but only in admiralty.

The dissent thus advocates a free-floating separation-of-powers approach, which might be necessary in a context where courts had no other alternative. Here, however, there is most certainly an alternative: Congress's adoption of a discretionary function test in the FTCA, combined with Congress's refusal to disturb many decades of unanimous judicial interpretation relying on that same congressionally-grounded test in the SIAA. *See majority op.* at 348 n.7. To upend this settled scheme serves no purpose whatsoever, particularly when no practical reason for differentiating between the FTCA and the SIAA has ever been advanced. While my dissenting colleague may make all sorts of assumptions about whether I would or would not dismiss this case under the discretionary function exception, the point is that the answer lies in the scope of the exception to governmental tort liability, not in a generalized application of the political question doctrine.

In the end, it makes sense to reflect on the sheer enormity of what appellants and our dissenting colleagues ask the court to do. They would have us strip the government of a discretionary function defense in the face of the considered wisdom of ten other circuit courts of appeals, each of which has held the discretionary function exception applicable to the SIAA. *See majority op.* at 338. They would do so in a context where sovereign prerogatives can be salient and where uniformity of interpretation would seem an imperative. They would have us adopt discordant approaches to two companion acts. And they would fasten upon the government the broadest conceivable waiver of its own separation-of-powers defenses, in derogation of the principle that sweeping waivers of immunity should not be casually assumed. *See Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261, 119 S.Ct. 687,

142 L.Ed.2d 718 (1999). Whether the discretionary function exception applies on these facts is rightly left to the district court upon remand. But our failure to recognize any exception whatsoever would set us on an aggressive course far afield of judicial competence and replete with matters of policy entrusted elsewhere. The court's opinion rightly rejects that option.[2]

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

After concluding that this court, sitting *en banc*, has the power to overrule the decision of a three-judge panel—a proposition with which I agree—the majority undertakes in Part II, *sua sponte* and without request or briefing by the parties, to determine as a supplement to our rule that one three-judge panel may not overrule another, *see Booth v. Maryland*, 327 F.3d 377, 383 (4th Cir.2003), that a three-judge panel confronted with two prior conflicting opinions *must* follow the earlier and "ignore" the later because the later opinion failed to follow the earlier opinion, *ante* at 333.

It is astounding to me that the majority finds itself free to decide issues neither raised by the case nor presented by the parties simply because it believes them important. And it is yet more astounding to me that the majority has announced in this advisory portion of its opinion the rule that panels of this court must follow the earliest of any prior conflicting opinions, when the majority itself acknowledges that "application of this rule does require a panel to effectively ignore certain opinions duly decided by a properly constituted panel of the court." *Ante* at 333. In announcing this rule the majority purports—illegitimately, I submit—to strip three-judge panels of judicial power and to abrogate longstanding aspects of the doctrine of *stare decisis*. One must ask now what the status is of a "duly decided" case that must yet be "ignored" under the majority's principle. Is the relief granted or the mandate issued to be ignored? Does a plaintiff have to return the money awarded it in the illegitimate case? Would a district court act *ultra vires* in following or in ignoring the mandate? Most importantly, where do we derive the authority to determine as a matter of rule that the duly decided opinions of a properly constituted panel of this court must be ignored by subsequent panels? It would seem to me that we could apply this principle only after amending 28 U.S.C. § 46 and recharacterizing Article III of the U.S. Constitution.

As respectfully as I can say it, this *sua sponte* advisory decision amounts to an unfortunate example of judicial hubris.

I

Carrie McMellon and her colleagues, who were injured when they rode Jet Skis over the Robert C. Byrd dam on the Ohio River, commenced this action against the United States under the Suits in Admiralty Act, alleging that the United States was negligent in failing adequately to warn them of the dam. The district court rejected the United States' claim of sovereign immunity but concluded that the United States had "no duty to erect warning signs to ensure safe navigation." Ac-

---

2. My friend in dissent says that I am guilty of "considerable overstatement." *Dissenting op.* at 367 n.4; *see also id.* at 373 n. 6. He tops off the point by asserting that the majority's agreement with ten other circuits is "one of the most far-reaching and obviously illegiti-
mate (as a matter of established constitutional doctrine) of any separation-of-powers analysis that [he has] encountered during [his] time on the federal bench." *Id.* at 362. Not to overstate the matter, but this assertion does cover a wee bit of ground.

cordingly, it entered summary judgment in favor of the United States.

It is only *this* judgment, entered by the district court, that we, sitting *en banc,* have been called upon to review on appeal. 4th Cir. Local Rule 35(c). In response, we have appropriately concluded that the United States has sovereign immunity under separation-of-powers principles, even though the Suits in Admiralty Act does not explicitly recognize the immunity, and that we need not reach the question of whether the United States owed the plaintiffs a duty to warn. In reaching this conclusion, we have overruled our earlier decision in *Lane v. United States,* 529 F.2d 175 (4th Cir.1975).

In their briefs, the parties have raised no question concerning our authority to overrule an earlier panel opinion. Nor have they raised the question of whether one panel of this court may overrule another. Even had they done so, our review would not require us to resolve the issue. Whether one panel of this court constituted under 28 U.S.C. § 46 can overrule another so constituted is irrelevant to this *en banc* review of the district court's judgment. Accordingly, the majority acts as a volunteer in expositing on this subject, and its exposition is at best an advisory opinion on which the majority received no counsel or briefing from the parties.

Early in its history, this Court held that it had no power to issue advisory opinions ... and it has frequently repeated

that federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them.

*North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (citing *Hayburn's Case,* 2 U.S. (2 Dall.) 409 (1792); *Muskrat v. United States,* 219 U.S. 346, 351–53, 31 S.Ct. 250, 55 L.Ed. 246 (1911)). One can only conclude therefore that to reach this question, the majority has exceeded its judicial power.*

Even were the majority to consider its decision to fall within some inherent rule-making authority—a decision no less fraught with the question of judicial power—such a rule would be totally ill-advised and unnecessary. When we recognize that we render opinions on a case-by-case basis, bringing to bear all applicable and available judicial decisions previously decided, and that we can always resolve intra-circuit splits by *en banc* rehearings, there simply can be no crisis requiring the issuance of such a rule.

Thus, not only is there no crisis *in this case,* as the parties have not even raised the issue, there is also no crisis in the way our court functions generally to require the announcement of so dramatic a rule. Yet the majority rationalizes the issuance of an advisory opinion that limits constitutionally conferred judicial power as being "of utmost importance to the operation of this court and the development of the law in this circuit." *Ante* at 332. The mere

---

* The majority argues in footnote 1 that this issue is "in this case" because it came before the three-judge panel that considered this case earlier in its procedural history. That this issue actually arose before a three-judge panel confronted with conflicting precedents does not, however, make it a live issue for this court *en banc.* The opinion of the three-judge panel has been vacated, and this court *en banc* reviews the judgment of the district court, not the three-judge panel. See 4th Cir.

Local Rule 35(c). The question of how a *three-judge panel* applies the doctrine of *stare decisis* when confronted by earlier conflicting decisions of other three-judge panels is not a controversy now before us, and our advisory ruling on that issue does not "affect the rights of [the] litigants in the case before [us]." *Rice,* 404 U.S. at 246, 92 S.Ct. 402. Obviously, the majority cannot mean by its phrase "in this case" that this is a live issue presently before this court.

issuance of such an opinion, I regretfully observe, defies our limited charge for exercising the judicial power.

## II

Setting aside the fundamental propositions that courts must decide only actual cases and controversies, not issues in the abstract, and that courts deciding cases must themselves apply the governing principles relating to their own jurisdiction and to *stare decisis,* I also submit that the substance of the rule announced is as flawed as the basis for issuing it. The majority holds that "application of the basic rule that one panel cannot overrule another requires a panel to follow the earlier of the conflicting opinions," *ante* at 333, and requires the panel "to effectively ignore certain opinions duly decided by a properly constituted panel of the court," *ante* at 333. As a matter of judicial power, however, such a rule cannot be required. In addition, such a rule, properly considered as a discretionary rule, is not even desirable, in that it forces courts to apply *stare decisis* in a narrow and mechanical way, without all of the doctrine's permutations and well-established exceptions.

The authority to decide cases falls within the judicial power articulated in Article III and implemented by the Judiciary Act. Thus, for example, when judicial power is conferred on the Supreme Court to decide a case or controversy, it may do so even if it overrules one of its earlier opinions. The limitation of that power is not mandated by Article III, nor by the Judiciary Act, but by self-imposed principles of *stare decisis* and tradition. "Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee,* 501

U.S. 808, 827; 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). But while *stare decisis* is a preferred course—a "principle of policy"— a court is not required to follow its precedent "when governing decisions are unworkable or are badly reasoned." *Id.* at 827–28, 111 S.Ct. 2597. And the Supreme Court in *Payne* noted that during the previous 20 terms, it had overruled 33 cases. *Id.* at 828, 111 S.Ct. 2597. Thus, a court has the judicial *power* to overrule its earlier rulings, but it constrains itself in order to create stability and integrity in the law. Analogous notions of judicial restraint are recognized also in the doctrine of the law of the case. *See Columbus–Am. Discovery Group v. Atl. Mut. Ins. Co.,* 203 F.3d 291, 304 (4th Cir.2000) (recognizing the law of the case as "a rule of discretion, not a jurisdictional requirement," which carries various exceptions and limitations).

In 28 U.S.C. § 46, implementing Article III, Congress has conferred judicial power on courts of appeals. Subsection (c) authorizes the courts of appeals to function through panels of "not more than three judges" or "the court in banc;" and subject-matter jurisdiction is conferred by 28 U.S.C. §§ 1291 and 1292. Thus, three-judge panels are authorized to exercise the judicial power conferred on courts of appeals, and that power includes the general power of the court to overrule its own earlier decisions. *Distinct three-judge panels are not distinct courts.* Rather, each panel operates with the full authority to issue opinions for the court of appeals of which it is a constituent part.

This is not to say, however, that in applying that power prudential rules should not be recognized to coordinate the decisions of the various panels. Indeed, the Fourth Circuit has adopted the prudential rule that a three-judge panel may not be overruled by a later panel, but rather only by the court sitting en banc.

*Booth,* 327 F.3d at 383. Not only do I agree fully with these prudential rules of *stare decisis,* I find them particularly helpful in promoting not only stability and integrity in the law, but also a unity of jurisprudence for a court authorized to act in distinct panels. But the rule that one panel may not overrule another is a court-adopted rule of prudence, not a limitation on constitutionally conferred judicial power.

The majority, falsely perceiving such a limitation, enforces this rule of prudence with the directive that a panel confronted with earlier conflicting decisions must follow the earliest precedent and *ignore* the later precedents that conflict with it, in effect declaring the later ones to be illegitimate. Such a rule denies the later court the power conferred on it by § 46 and strips the doctrine of *stare decisis* of all its subtleties. Because § 46 authorizes a court of appeals to act fully through the decisions of three-judge panels, every three-judge panel has full judicial authority to decide a case, to rule on its jurisdiction, and to apply *stare decisis* in the most nuanced manner that it deems appropriate. If a panel exceeds its jurisdiction or violates established principles of *stare decisis* or even resolves a prior conflict in a manner unacceptable to the court as a whole, the court remains free to rehear the case *en banc* as authorized by § 46, thereby obtaining the judgment of every judge on the court. The majority does not indicate why this mechanism, currently in place, is insufficient to ensure the stability and integrity of our circuit jurisprudence. Instead, it takes the radical step of directing a panel to "ignore certain opinions duly decided by a[n] [earlier] properly constituted panel." *Ante* at 333. Its decision is thus both illegitimate and ill-advised.

Further, because two conflicting panel decisions are both constitutionally legitimate, the majority's rule not only inappropriately restricts judicial authority, it also fails to fix the problem. Indeed, *by requiring a panel to discard the more recent of conflicting decisions, the majority requires a panel to violate the rule that one panel cannot overrule the other.* Moreover, in the face of this necessary evil, the majority does not even allow the latest panel to minimize the damage created by the conflict by choosing the *best* rule. Instead, it must mechanically follow the earliest decision, however incorrect and ill-considered it might be.

Perhaps the majority characterizes its proposed policy as "required" because it provides the only enforcement mechanism the majority can conceive for the rule that a panel cannot overrule a prior panel. (It is an enforcement mechanism in the sense that, under the majority's rule, a panel that ignores a prior panel will itself be ignored by future panels.) However, no rule *requires* an enforcement mechanism; without one, it is still a rule. *See* H.L.A. Hart, *The Concept of Law* 10–11, 18–25 (2d ed.1997). Rules merit adherence by virtue of their legitimacy, and their legitimacy is determined by their mode of enactment, not enforcement. A panel's obligation to follow decisions of prior panels, derived from the doctrine of *stare decisis,* would not disappear if there were no punishment for breaking this rule. The majority's holding is not, therefore, a corollary to the rule that panels cannot overrule prior panels. Rather, it is an effort to strip subsequent panels of the judicial authority conferred by the Constitution and the Judiciary Act and to deny them the authority to decide what is best when conflicts among earlier precedents appear.

Indeed, simply as a matter of policy, it would seem to me to be far better for a panel faced with conflicting and equally

valid authority to be able to choose between them. *See, e.g., Under Seal v. Under Seal,* 326 F.3d 479, 484 (4th Cir.2003). *First,* as mentioned above, the earliest panel decision may be simply wrong; it may plainly misinterpret a statute, for instance, or plainly conflict with other rules. Even if the earlier decision seemed correct at the time it was rendered, its soundness could be disturbed by other developments in the law. *Second,* allowing a panel to choose between conflicting authority would encourage the panel to more fully consider *both* prior opinions, perhaps finding a way to distinguish and thus reconcile them after all. *Third,* without a directive to follow the earliest opinion, the panel would apprehend more readily the need to call for a rehearing *en banc,* rather than allowing a flawed or incorrect rule to continue indefinitely, simply because it came earliest in time. When two separate panels of our circuit have come to opposite conclusions, the issue over which they have split is likely an important and difficult one, and it is best resolved with a rehearing *en banc,* not an uncritical reversion to the earliest panel's conclusion.

In vigorously disagreeing with the majority, I do not wish to be understood as disagreeing with our court's rule that in furtherance of the doctrine of *stare decisis* one panel should not overrule another panel and that panel opinions may be overruled only by an *en banc* court. It is important, however, to understand the distinction between a limitation on the judicial power of a panel and the prudential constraint exerted by the doctrine of *stare decisis.* If we do not understand and recognize such distinctions, we risk rewriting Article III and the Judiciary Act to include all our common-law doctrines of judicial prudence.

### III

For the reasons given, I dissent from Part II of the majority opinion. I concur in the remainder.

DIANA GRIBBON MOTZ, Circuit Judge, concurring in part and dissenting in part:

The majority holds that the statutory text and the legislative history of the Suits in Admiralty Act (SIAA), 46 U.S.C. app. §§ 741–52 (2000), demonstrate that Congress did not exclude discretionary functions from the SIAA's express waiver of sovereign immunity. With this conclusion, I completely agree.[1] My colleagues proceed, however, to "read into" the SIAA sovereign immunity waiver a discretionary function exception. *Ante* at 334, 338, 343, 348. Apparently, they believe that separation-of-powers principles somehow preclude us from applying the SIAA as it was "clear[ly] and unequivocal[ly]" written. *Id.* at 344. From this holding, I must respectfully dissent.

### I.

At first blush, I had thought that the Government's arguments that Congress intended to exclude discretionary acts from the SIAA's waiver of sovereign immunity might carry the day. After all, a number of our sister circuits have found such arguments persuasive. *See, e.g., Sea–Land Serv., Inc. v. United States,* 919 F.2d 888, 890–91 (3d Cir.1990); *Robinson v. United States (In re Joint E. & S. Dists. Asbestos Litig.),* 891 F.2d 31, 34–35 (2d Cir.1989); *Williams v. United States,* 747 F.2d 700 (11th Cir.1984) (per curiam), *aff'g,*

---

1. Accordingly, I join Part IV.A of the majority opinion; I also join Parts I, II, and III; I dissent from Parts IV.B and V.

*Williams ex rel Sharpley v. United States,* 581 F.Supp. 847 (S.D.Ga.1983); *Canadian Transp. Co. v. United States,* 663 F.2d 1081, 1086 (D.C.Cir.1980).

The majority, however, engages in a far more nuanced analysis than our sister circuits. Writing for the majority, Judge Traxler carefully examines not only the text and legislative history of the SIAA and Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2680 (2000), but also relevant canons of statutory construction. He concludes that to hold Congress intended the SIAA waiver of sovereign immunity "to be subject to an exception for discretionary functions" would be untenable. *Ante* at 340. Judge Traxler's thorough discussion of these issues for the majority is completely persuasive; indeed, I find his reasoning to be unassailable.

This holding would seem to me to end the matter. That the SIAA waiver of sovereign immunity plainly does not include, and Congress did not intend it to include, a discretionary function exception would seem to require a court to simply apply the Act without the exception. The majority's insistence on "read[ing]" a discretionary function exception "into" the SIAA, *ante* at 334, 338, 343, 348, particularly after its excellent statutory analysis, puzzles me.

Of course, a court can "read into" an *ambiguous* statute a provision necessary to save it from a declaration of unconstitutionality. *See, e.g., Zadvydas v. Davis,* 533 U.S. 678, 689, 696–98, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (reading a reasonableness limitation into the Immigration and Nationality Act in order to avoid its constitutional invalidation). In the case at hand, however, the majority has expressly held the SIAA waiver of sovereign immunity is not ambiguous, but rather "clear and unequivocal." *Ante* at 340. Thus, it cannot rely on the constitutional avoidance doctrine. *See Dep't of Hous. and Urban Dev.*

*v. Rucker,* 535 U.S. 125, 134, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002) (holding that the doctrine of constitutional avoidance "has no application in the absence of statutory ambiguity") (internal quotation marks and citation omitted).

Absent reliance on this doctrine—or any indication (and there is none here) that the plain meaning of a statute would lead to results that are absurd or contrary to Congress's purpose—judges have no business "read[ing]" provisions "into" statutes. *Ante* at 334. Rather, the Supreme Court has consistently recognized courts' "duty to refrain from reading a phrase into the statute when Congress has left it out." *Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993); *see, e.g., United States v. Oakland Cannabis Buyers' Coop.,* 532 U.S. 483, 490, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) (refusing to "read into" the Controlled Substances Act a medical necessity defense available at common law); *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 15–16, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (refusing to "read an 'Indian trust' exemption into" the Freedom of Information Act when there was "simply no support for the exemption in the statutory text"); *Bates v. United States,* 522 U.S. 23, 29–33, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) (refusing to "read[ ] ... into" 20 U.S.C. § 1097(a) the "intent to defraud" requirement of 20 U.S.C. § 1097(d) when "nothing in the text, structure, or history of § 1097(a) warrant[ed] importation" of such a requirement, and noting that "this Court ordinarily resists reading words into a statute that do not appear on its face"); *United States Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 154, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989) (refusing to "read into" the Freedom of Information Act "a disclosure exemption that Congress did not it-

self provide"); *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 836–37, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (refusing to "read into" ERISA § 514(a) a limitation expressly included in another ERISA provision); *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Employees,* 481 U.S. 429, 447, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (refusing to "read ... into the silence of" the Railway Labor Act a limitation on union self-help that existed at the time the Act became law); *United States v. Pa. Indus. Chem. Corp.,* 411 U.S. 655, 663–64, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973) (refusing to "read into" § 13 of the Rivers and Harbors Act of 1899 a provision found elsewhere in that Act and in the Rivers and Harbors Act of 1905).

In a holding especially relevant here, the Court rejected the view of several courts of appeals and held that a "reasonably necessary" qualification should not be "read into" a statutory provision. *Henderson v. United States,* 476 U.S. 321, 330, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). In another case that resonates here, the Court refused to read into one statute an exception from another "without an affirmative indication" that Congress intended this, especially when doing so would, as here, "carve a substantial slice" from the statutory coverage. *Erlenbaugh v. United States,* 409 U.S. 239, 247, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). Repeatedly, the Court has cautioned that federal courts are simply "not at liberty to create an exception where Congress has declined to do so." *Hallstrom v. Tillamook Co.,* 493 U.S. 20, 27, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989); *accord Freytag v. Comm'r of Internal Revenue,* 501 U.S. 868, 873–74, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).

In short, given the majority's express holding that the evidence here does *not* show that Congress intended to incorporate a discretionary function exception into the SIAA, Supreme Court precedent dictates that we not "read into" the Act such an exception. Indeed, the Court has stated that to do so absent any such evidence would "constitute standardless judicial lawmaking." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 762, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

## II.

Without acknowledgment of this binding precedent, the majority relies only on asserted "separation-of-powers principles" to "read into" the SIAA's waiver of sovereign immunity a discretionary function exception. The majority finds support for its conclusion that separation-of-powers principles require its extraordinary "reading in" of a discretionary function exception in two sources. Neither provides any basis for ignoring the established limits of the constitutional avoidance doctrine or the Supreme Court's repeated admonitions that judges *not* read exceptions or qualifications into unambiguous statutes.

## A.

First, the majority looks to the Supreme Court's decision in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). There, the Court discussed the policy concerns motivating Congress to include an *express* discretionary function exception in the *FTCA* waiver of sovereign immunity, as follows:

Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took steps to

protect the Government from liability that would seriously handicap efficient government operations.

*Id.* at 814, 104 S.Ct. 2755 (internal quotation and citation omitted).

From this statement, the majority draws two conclusions: (1) the statement assertedly "makes it clear that the [express discretionary function] exception [in the FTCA] is a statutory embodiment of [constitutional] separation-of-powers concerns"; and (2) when this is understood as the "purpose of the discretionary function exception in the FTCA," it assertedly "becomes apparent that the absence of such an exception in the SIAA is problematic, to say the least." *Ante* at 341. Both conclusions are unsupportable.

The *only* thing the *Varig Airlines* statement "makes clear" is that the Supreme Court believed that, when Congress enacted an express discretionary function exception to the FTCA, it sought to prevent "judicial 'second-guessing'" of certain "legislative and administrative decisions." *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755. The statement does not "make clear" that either Congress, or the Court, regarded the discretionary function exception in the FTCA as an "embodiment of separation-of-powers concerns." *Ante* at 341. Indeed, little indicates that either Congress or the Court, in fact, believed this; neither body so much as mentions, even in passing, "separation-of-powers concerns."

Moreover, even if the *Varig Airlines* Court had found that Congress sought to avoid "separation-of-powers concerns" when it enacted the FTCA exception, this does not constitute a suggestion, let alone a holding, that a statute without such an exception is unconstitutional or "problematic." Rather, the legislative history recounted by the Court in *Varig Airlines*— that Congress expressly incorporated a

discretionary function into the FTCA, in the face of an executive opinion that such legislation was not needed because courts would imply such an exception—seems to suggest just the opposite. This history indicates Congress ultimately concluded that nothing—including any separation-of-powers concerns—would require courts to imply a discretionary function exception, and so it had to enact specific legislation to that effect.

### B.

General statements as to the important policies advanced by "the checks and balances ... built into the tripartite Federal Government," *Buckley v. Valeo,* 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), provide the only other basis offered by the majority in support of its remarkable decision to "read into" the SIAA a discretionary function exception. *See ante* at 340–44. If courts determined policy, I might agree with the majority, but such decisions belong to Congress. And, although it tries mightily, the majority fails to demonstrate that "separation-of-powers concerns" justify its own policy-driven decision.

Rather, the majority simply quotes general separation-of-powers principles and then holds that, without a discretionary function exception, the SIAA would violate these principles by "substantially impair[ing]" the "executive branch's ability to 'faithfully execute[ ]' the law." *Ante* at 342. Even if we could so construe an unambiguous statute, which we cannot, the majority's argument fails. For, as the Supreme Court has long recognized, Congress can "control the execution of its [statutes] ... indirectly—by passing new legislation." *Bowsher v. Synar,* 478 U.S. 714, 733–34, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *accord INS v. Chadha,* 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 77 L.Ed.2d

317 (1983). Indeed, the majority itself implicitly recognizes this. *Ante* at 343–44 n. 5 (noting Congress can control execution of laws by including detailed statutory requirements). Given this power, no separation-of-powers principle prevents Congress from choosing to affect the execution of its various maritime statutes, indirectly, by imposing tort liability on the federal government.[2]

In contrast, clear separation-of-powers principles do prohibit courts from "read[ing] into" the SIAA a discretionary function provision. Because the federal lawmaking power is "vested in the legislative, not the judicial branch of government," *Northwest Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 95, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), courts have an "obligation to avoid judicial legislation." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). When, as here, "nothing in the legislative history remotely suggests a congressional intent contrary to Congress' chosen words . . . any further steps take the courts out of the realm of interpretation and place them in the domain of legislation." *United States v. Locke*, 471 U.S. 84, 96, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). If Congress "enacted its intention into law in a manner that abides with the Constitution, that is the end of the matter; [f]ederal courts are bound to apply laws enacted by Congress with respect to matters . . . over which it has legislative power." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (internal quotation marks and citation omitted). To go beyond applying the statute passed by Congress would effectively be to "judicially rewrit[e]" it and thereby impermissibly "usurp the policymaking and legislative functions of duly elected representatives." *Heckler v. Mathews*, 465 U.S. 728, 741–42, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984).

Thus, well-established separation-of-powers principles, rather than supporting the holding reached by the majority, mandate that we not "read into" the SIAA's waiver of sovereign immunity a discretionary function exception. For these principles—so important in safeguarding the "encroachment or aggrandizement of one branch at the expense of another," *Buckley*, 424 U.S. at 122, 96 S.Ct. 612—require courts to apply a statute as written by the legislature. Only by doing so can the judicial branch avoid "arrogat[ing] power to itself" or "impair[ing]" the legislative branch "in the performance of its constitutional duties." *Ante* at 341 (quoting *Loving v. United States*, 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996)).[3]

---

2. The attempt to analogize the discretionary function exception to § 1983 qualified immunity, *ante* at 351 (Wilkinson, J., concurring), misses the mark. Qualified immunity protects officials from the "fear of personal monetary liability." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The SIAA, regardless of whether a court "reads into" it a discretionary function exception, subjects no official to "personal monetary liability." *Id.* Moreover, the suggestion that, absent qualified immunity, "neither federal, state nor local government could function," *ante* at 351 (Wilkinson, J., concurring), is simply wrong. Although government officials accused of violating the federal Constitution and federal statutes are entitled to assert a qualified immunity defense, those accused of violating identical state constitutional and statutory provisions often cannot avail themselves of this defense. *See, e.g., Robles v. Prince George's County*, 302 F.3d 262, 273 (4th Cir.2002). Yet, even without the benefit of the qualified immunity defense, these officials certainly continue to "function."

3. My friends in the majority repeatedly note that our sister circuits have reached the same conclusion that they do. *See ante* at 337–38 348 n. 7; *see also id.* at 353 n. 2 (Wilkinson, J., concurring). Given the majority's acknowledgment that a number of these opin-

### III.

For all of these reasons, I would follow our decision in *Lane v. United States*, 529 F.2d 175 (4th Cir.1975), and hold that the SIAA contains no discretionary function exception to its sovereign immunity waiver. With great respect, I dissent from the majority's contrary conclusion.

Judge Michael joins in this opinion.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent. I would not over-rule *Lane v. United States*, 529 F.2d 175 (4th Cir.1975).

I am in agreement, in general terms, with the reasons expressed in the Introduction to and in Part I of Judge Luttig's dissenting opinion, and, as well, I agree with Part II of Judge Motz's dissenting opinion.

I would add a word. The result obtained by the majority was predicted more than 200 years ago in the *Eleventh Essay of Brutus*, the conclusion of which I quote here:

When the courts will have a precedent before them of a court which extended its jurisdiction in opposition to an act of the legislature, is it not to be expected that they will extend theirs, especially when there is nothing in the constitution expressly against it? and they are au-thorised to construe its meaning, and are not under any controul?

This power in the judicial, will enable them to mould the government, into al-most any shape they please. The manner

in which this may be effected we will hereafter examine.

*Brutus XI*, 31 January 1788.

LUTTIG, Circuit Judge, dissenting:

The separation-of-powers analysis on the strength of which the majority judi-cially engrafts upon the Suits in Admi-ralty Act (SIAA), 46 U.S.C. app. §§ 741–52 (2000), a discretionary function excep-tion is one of the most far-reaching and obviously illegitimate (as a matter of es-tablished constitutional doctrine) of any separation-of-powers analysis that I have encountered during my time on the fed-eral bench. It is plain that, in judicially forbidding the "clear and unequivocal" waiver of sovereign immunity that both the Congress and the Executive agreed upon in the SIAA, the court fundamen-tally misunderstands the principle of sep-aration of powers, mistakenly equating li-ability on behalf of the United States with infringement on the Executive's power to execute the laws. Indeed, the level of misunderstanding in this regard is breathtaking.

Not only are the separation-of-powers concerns that the court believes require its conclusion not "compelling"; separation of powers properly understood, those con-cerns are altogether nonexistent. That the Congress of the United States (togeth-er with the President himself, incidentally) chooses to render the *United States* liable for a boating accident caused by the negli-gence of government officials, on the same terms as would a private individual be liable for such accident, does not even

---

ions rest on "cursory analysis," *ante* at 344, I am surprised at this reliance. Moreover, I note that agreement among courts of appeals on an issue—even in thoughtful, well-rea-soned opinions—does not invariably garnish Supreme Court approval. Rather, the Court often rejects a view previously adopted by a number of the circuit courts. *See, e.g.,*

*Henderson*, 476 U.S. at 330, 106 S.Ct. 1871. Indeed, not infrequently the Court disagrees with the nearly unanimous view of the cir-cuits. *See, e.g., Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (rejecting a holding previously reached by most of the federal courts of appeals).

arguably encroach upon the *Executive's* constitutional power to faithfully execute the laws. And, of course, no more so does it require exercise of that Executive power by the Judiciary.

Because the decision of Congress (and the President) to waive immunity broadly does not itself raise any separation-of-powers concern, much less one that would necessitate the extraordinary interpretative action of judicial *implication* of a categorical discretionary function exception, which even the majority concedes Congress never intended, I dissent.

Judge Wilkinson, in concurrence, protests, but too much, that the court has not gone on a "statutory frolic of its own." But this is precisely what he proposes. And his attempt to justify the court's action exclusively on public policy grounds, without even a pass at a traditional or statutory legal analysis, only further highlights the legal error committed by the court today.

## I.

### A.

By every traditional measure of statutory interpretation, the waiver of the federal government's immunity from suit in the SIAA must be read *not* to include an exception for discretionary functions. *See* 46 U.S.C. app. § 742. To its credit, the majority does not even contend otherwise.

As to the text of the SIAA, the majority explains,

> [T]he SIAA includes no list of exceptions to its waiver of sovereign immunity, but instead provides only that the government is entitled to the limitations of

liability that are available in admiralty to private defendants. Thus, the plain language of the SIAA seems to reflect a Congressional intent that discretionary acts should *not* be excluded from the waiver of sovereign immunity.

*Ante* at 339.

As to the legislative history of the SIAA, the majority rejects as "rather remarkable" and "difficult ... to accept" the government's argument that a remark made by an Assistant Attorney General in 1942 during a congressional hearing on the Federal Tort Claims Act,[1] should guide the court's interpretation of the SIAA, which was enacted twenty-two years earlier in 1920 and amended eighteen years later in 1960. The majority explains that, when Congress itself finally enacted the FTCA four years after this statement, it did not accept the Assistant Attorney General's assurance; instead it included an express exception for discretionary functions of the government in the FTCA. *See* 28 U.S.C. § 2680(a). The majority then reasons quite rightly that, if the legislative history of the *FTCA* is to be given any effect in interpreting the *SIAA*, it argues *against* construing the SIAA to include a discretionary function exception:

> [I]f the [discretionary functions] exception remained as important to Congress in 1960 when it amended the SIAA as it was when the FTCA was enacted, then it stands to reason that Congress would have written the exception into the SIAA then, particularly since the 1960 SIAA amendments transferred jurisdiction over a number of claims from the FTCA to the SIAA.

---

1. The Assistant Attorney General allowed that, "claims of the kind embraced by the discretionary function would have been exempted from the waiver of sovereign immunity by judicial construction," even if such an exemption was not expressly included in the FTCA. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 810, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

*Ante* at 340.[2]

And, as to "familiar canons of statutory construction," the majority, likewise, correctly rejects the government's argument that the SIAA's waiver of sovereign immunity in the SIAA is ambiguous with respect to discretionary functions, reasoning that,

> the waiver of sovereign immunity contained within the SIAA [ ] is *clear and unequivocal,* providing that an *in personam* admiralty action may be brought against the government if such an action could be maintained against a private person. Contrary to the government's suggestion, we simply cannot create an ambiguity in the *SIAA* by looking to the language and structure of the *FTCA.*

*Ante* at 340.

With each of these conclusions, as to the Act's statutory text, legislative history, and the import of traditional tools of statutory construction, I could not agree more. And, of course, I also agree with the majority's understated conclusion that, in light of these considerations, one "cannot conclude that Congress clearly intended

for the SIAA's waiver of sovereign immunity to be subject to an exception for discretionary functions, nor can [one] reach that conclusion by resort to traditional tools of statutory construction." *Ante* at 340. In fact, as the majority ably demonstrates in its wholesale rejection of the government's statutory arguments, both the text of the SIAA and "traditional tools of statutory construction" prove precisely the opposite, that Congress intended *not* to except discretionary functions from its waiver of sovereign immunity in the SIAA.

### B.

Despite its own acknowledgment of the conclusive nature of the statutory text and legislative history, however, the majority holds that it is nevertheless "required" by separation-of-powers principles to "read into the SIAA's waiver of sovereign immunity a discretionary function exception," *ante* at 343. Undoubtedly in an effort to play down the import of its extraordinary holding, the majority maintains that it reaches this result as a matter of statutory

---

**2.** The evidence with regard to the history of congressional action is even stronger than the majority explains. The SIAA was enacted in 1920, *predating* enactment of the FTCA (and the discretionary functions exception that the majority now holds must be "read into" the SIAA) by 26 years. Prior to its amendment in 1960 to include maritime activities previously covered by the FTCA, the SIAA, along with the Public Vessels Act (PVA), waived the government's immunity from suit for injuries caused by public or merchant vessels. Just as now, the SIAA's waiver of sovereign immunity did not include any exceptions. Accordingly, as the majority recounts, both Acts were interpreted by the Supreme Court and the lower courts to apply to allegedly tortious actions of the government that would surely have fallen under the discretionary functions exception if a similar claim were raised under the FTCA. *See ante* at 347–48 (listing lower court cases); *Canadian Aviator, Ltd. v. United*

*States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945) (holding the guidance of a Navy control boat during World War II to be within the coverage of the PVA); *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954) (holding the government's decision to allow Chinese soldiers aboard a ship to be negligent in light of well-known risk of polio).

The 1960 amendment expanded the range of governmental activities for which the SIAA subjected the government to liability beyond those taken by public and merchant vessels, to include all maritime actions, but it did nothing to alter the broad scope of the SIAA's waiver of immunity. Thus, contrary to the government's argument, the *only* permissible inference from this history is that the government must be held liable for those activities that the 1960 amendment expanded the SIAA so as to include, for the same range of conduct for which it had been held liable prior to the amendment.

interpretation.[3] But, of course, in actuality it reaches its result as a matter of constitutional principle of the highest order. And its reconstruction of the statute on the basis of this constitutional principle is indefensible.

Though the majority does not say so explicitly, its contention that it may "read into" the SIAA an exception where the Act itself is "silent" is apparently founded on the canon of constitutional avoidance, *see ante* at 344, which provides that statutory ambiguity should be resolved in a manner that avoids difficult constitutional questions out of "respect for Congress, which we assume to legislate in the light of constitutional limitations." *Harris v. United States,* 536 U.S. 545, 556, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (quoting *Rust v. Sullivan,* 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). The canon of avoidance is not applicable here, however, because, as the majority itself holds, the SIAA's waiver of sovereign immunity is "clear and unequivocal." *See United States v. Oakland Cannabis Buyers' Coop.,* 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) (holding that "the canon of constitutional avoidance has no application in the absence of statutory ambiguity"). I could not state it any clearer than does the majority: "The waiver of sovereign immunity contained within the SIAA [ ] is *clear and unequivocal,* providing that an *in personam* admiralty action may be brought against the government if such an action could be maintained against a private person. Contrary to the government's suggestion, [the court] *simply cannot create an ambiguity* in the *SIAA* by

looking to the language and structure of the *FTCA." Ante* at 340 (emphasis added).

The majority attempts to avoid the problem that the SIAA's unequivocal waiver poses to its invocation of the avoidance canon by characterizing the SIAA at a different point in its opinion as "silent" on the particular question of whether immunity for the performance of discretionary functions is waived. This argument, for which the majority does not offer even a word of support, is no more availing than the government's contention, rejected by the majority, that the SIAA is ambiguous. The SIAA provides that, "in cases where ... if a private person or property were involved, a proceeding in admiralty could be maintained," suit may be brought against the United States government. 42 U.S.C. app. § 742. Because private persons clearly may be sued for negligent, discretionary actions, the unambiguous meaning of this statute is that the government may be sued for these actions as well. In no sense at all does the absence of an exception from the Act's general waiver of sovereign immunity render the Act "silent" on the question of whether that waiver should be interpreted to include the exception. *See Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 211–12, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *Engine Mfrs. Ass'n v. E.P.A.,* 88 F.3d 1075, 1088 (D.C.Cir.1996) (providing that, if the text of a statute "clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is 'silent' "). Rather, the absence of the exception, coupled with

---

**3.** Thus, for example, the majority would have the reader believe that the court "do[es] not consider" whether, within the bounds of the Constitution, Congress would have the power to subject the government to liability for its discretionary acts if it chose to do so, *ante* at 343–44 & n. 5, because it ultimately concludes that the SIAA is "silent" as to whether it includes an exception for discretionary acts, eliminating any need to decide the larger constitutional question. As explained infra, however, the court's own analysis betrays that it does not believe that the SIAA is "silent" on this point.

the imposition of liability on the United States on the same terms as would a private individual be liable, is about as clear an expression of congressional intent to waive the government's sovereign immunity broadly as can be imagined.

The majority obviously has failed to appreciate that"[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *United States v. Locke*, 471 U.S. 84, 95, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978)). The canon of avoidance provides that a court may do the former to avoid raising constitutional issues, but under no circumstance does it provide justification for a court to undertake the latter. *Whitman v. American Trucking Ass'n.*, 531 U.S. 457, 471, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("No matter how severe the constitutional doubt, courts may choose only between reasonably available interpretations of a text."); *Yeskey*, 524 U.S. at 212, 118 S.Ct. 1952. "Any other conclusion, while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution." *United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). In this case, the SIAA's waiver of sovereign immunity is complete and leaves no gap to be filled; the court's contrary "construction" of the Act to include an exception missing from the text of the Act itself represents nothing more than judicial legislation within the meaning of *Albertini*. As the Supreme Court explained in dismissing a similar argument that the FTCA must be read to exclude "core government functions" from liability despite the absence of such an exemption from the statutory text: "There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it." *Rayonier Inc. v. United States*, 352 U.S. 315, 320, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

In sum, the SIAA is not "silent" on the question of whether its waiver of sovereign immunity includes waiver of immunity from claims for injuries caused by the government's discretionary acts any more than a will directing that the entirety of a deceased's estate be given to his spouse is "silent" on the. question of whether that direction includes his house. Indeed, because the Act is *unambiguous* on this issue, the canon of constitutional avoidance—the means through which the majority engrafts a discretionary function exception here—is flatly inapplicable. I would affirm our court's decision in *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975), and hold that the SIAA means what it says: a "nonjury proceeding *in personam* may be brought against the United States" wherever a suit could be maintained "if a private person or property were involved." 46 U.S.C. app. § 742.

## II.

In high irony, the majority rejects this holding, which actually is compelled by the principle of separation of powers, in an effort to avoid what the majority perceives to be, but which emphatically are not, two separate affronts to that principle. First, and primarily, the majority believes that the imposition of liability on the government for its discretionary acts would represent an encroachment *by Congress* on "[t]he executive branch's ability to 'faithfully execute[ ]' the law, U.S. Const., art. II § 3." *Ante* at 342; *see also id.* at 343–44 n. 5. Second, the majority believe that, were the SIAA interpreted to subject the government to liability for its discretionary

functions, *"the judiciary* would be called upon to decide issues it is not equipped to resolve," and would be forced to "second-guess" the wisdom of policy decisions made by the government. *Ante* at 341. So severe does the majority believe these two potential problems to be that a fair reading of its opinion is that it believes that it would likely be unconstitutional for Congress to subject the government to liability for its performance of discretionary acts under any circumstance. *See id.* at 343–44 n. 5.

Neither of these two perceived separation-of-powers problems even arguably requires that, as a categorical matter, the government be immune from liability whenever its tortious acts may be characterized as discretionary. The majority's contortion of the statutory text of the SIAA, in other words, is ultimately as unnecessary constitution-ally as it is impermissible statutorily.

## A.

### 1.

As to the first of the majority's separation-of-powers concerns, the absence of a discretionary function exception from the SIAA, whatever else it may be, is not even arguably an impermissible encroachment on the Executive's duty to faithfully execute the laws. The *only* effect the SIAA's blanket waiver of immunity has is to subject the government to liability for a larger class of conduct than would be the case if certain government functions were excepted from the Act's coverage. And not even the majority identifies a single law that the Executive would be prohibited from or impeded from enforcing were the court to interpret this broad waiver of sovereign immunity as it was written to include discretionary functions, or even to explain the way in which the Executive's enforcement powers could be affected by the liability that such a waiver creates.[4]

**4.** Judge Wilkinson, in his separate opinion, argues that "the discretionary function exception is ... implied only in the same sense that the doctrine of qualified immunity is implied in the interpretation of 42 U.S.C. § 1983—on the premise that without the ability to exercise some element of judgment in the execution of law, neither federal, state, nor local government could function." *Ante* at 350 (Wilkinson, J., concurring).

Of course, this comparison overlooks the critical distinction between suits brought pursuant to the SIAA and actions brought under 42 U.S.C. § 1983, and, thereby, greatly exaggerates any disruption in Executive action which liability under the SIAA would create. Actions brought under 42 U.S.C. § 1983 are filed against the officer in his personal capacity and subject the officer himself to liability. Absent a protection for actions taken where "the law did not put the officer on notice that his conduct would be clearly unlawful," *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), such possibility of personal ruin would doubtless cause Executive officers to act with an overabun-

dance of caution. *See Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Suits under the SIAA, in contrast, do not raise the same concerns because they are brought against the United States and produce damages awards assessable against the federal fisc, not the relevant Executive officer. *See infra* at 370–71 (citing 46 U.S.C. app. § 748).

It may still be that some officers of the government, not wanting to subject their government to a claim in negligence, may act with added care, but any such influence would be minuscule when compared to the prospect of personal liability, as the Supreme Court has repeatedly recognized. *Compare Owen v. City of Independence,* 445 U.S. 622, 656, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) ("The inhibiting effect [of liability] is significantly reduced, if not eliminated, however, when the threat of personal liability is removed."); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 405 n. 29, 99 S.Ct. 1171, 59 L.Ed.2d 401 ("[T]he justifications for immunizing officials from personal liability have little force when suit is brought against the governmental entity it-

*Although it does not realize it, the problem facing the majority is one relating to first principles: It has misunderstood— and fundamentally so—the very separation-of-powers principle that it believes compels its holding.* The majority has equated governmental immunity from liability with the execution of the laws, holding that, if by statute the government is rendered liable, then *ipso facto* the Executive's power to execute the laws has been "substantially impaired." *Ante* at 342 (relying on examples of potential government liability to "illustrate" that "if the SIAA does not include a discretionary function exception, the executive branch's ability to 'faithfully execute[ ]' the law would be substantially impaired") (internal citation omitted); *ante* at 350 (citing Congress' "desire to protect certain governmental activities from exposure to suit by private individuals" as the "separation of powers concern" that "drove Congress to create the discretionary function exception to the FTCA"); *see also ante* at 350 (Wilkinson, J., concurring) (stating that "the executive has an explicit, not an implicit, duty to see that the laws are faithfully executed" and that "to subject [the Executive's] . . . discretionary act[s] to the prospect of tort liability . . . undercut[s] [that] explicit constitutional command"). To equate the Executive's duty to "faithfully execute the Laws" under Article II of the Constitution, with governmental immunity, is to fundamentally misapprehend both concepts. I would not have thought it needed saying, but the laws that the Executive is charged to enforce are those enacted by the Congress. Within contours limited only by the Constitution, Congress possesses the power to set the legal parameters within which the Executive and its officials must act and to provide a remedy to citizens injured by the government's failure to observe those parameters. *See Bowsher v. Synar*, 478 U.S. 714, 733, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (explaining that "once Congress makes its choice in enacting legislation . . . [it] can thereafter control the execution of its enactment . . . indirectly—by passing new legislation"); *Buckley v. Valeo*, 424 U.S. 1, 132, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (providing that "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction so long as the exercise of that authority does not offend some other constitutional restriction") (internal citation omitted). And when it does so, there is no argument of any kind that it has encroached upon the Executive's Article II, sec. 3 power. As the Tenth Circuit recently explained,

when Congress is exercising its own powers with respect to matters of public

---

self."); *Berkley v. Common Council City of Charleston*, 63 F.3d 295, 301 (4th Cir.1995) (*en banc*) *with id.* at 305 (Wilkinson, J., dissenting) (arguing that, "as a practical matter, [concerns about the effect of subjecting individual legislators to liability] are no less powerful when the legislative entity itself is sued").

Judge Wilkinson also contends, in considerable overstatement, that, "[s]horn of a discretionary function exception, the executive branch would be profoundly impaired in carrying out the very functions that Congress has assigned to it." *Ante* at 351–52 (Wilkinson, J., concurring). Not only can this contention not be squared with the fact that this Circuit has, with two arguable exceptions, subjected the government to liability for its discretionary functions since the SIAA's enactment in 1920 without any serious disruption in the functioning of the Executive. *See Lane*, 529 F.2d at 179; *United States v. The S.S. Washington*, 241 F.2d 819, 821 (4th Cir.1957); *Pacific–Atlantic S.S. Co. v. United States*, 175 F.2d 632 (4th Cir.1949). But it is also irreconcilable with the numerous other avenues that Congress has provided for challenging the propriety of discretionary Executive action, even prior to the Executive's ability to take that action. *See, e.g., infra* at 370–71 (discussing the opportunity for judicial review provided in NEPA and the APA).

right, the executive role of 'tak[ing] Care that the Laws be faithfully executed,' is entirely derivative of the laws passed by Congress, and Congress may be as specific in its instructions to the Executive as it wishes.

*Biodiversity Assoc. v. Cables,* 357 F.3d 1152, 1162 (10th Cir.2004) (internal citation omitted); *see id.* ("To give specific orders *by duly enacted legislation* in an area where Congress has previously delegated managerial authority is not an unconstitutional encroachment on the prerogatives of the Executive; it is merely to reclaim the formerly delegated authority.") (emphasis in original); *Stop H–3 Assoc. v. Dole,* 870 F.2d 1419, 1437 (9th Cir.1989).

Congress' judgment in the SIAA to limit the Executive's discretion through tort liability on the same terms as would exist for a private individual is no less constitutional than the requirement under the National Environmental Policy Act that the Executive first prepare an environmental impact statement before undertaking an act that may cause environmental harm, *see* 42 U.S.C. § 4332, or, even more generally, the requirement under the Administrative Procedures Act that Executive agencies implement the substantive laws they are charged with enforcing reasonably and non-arbitrarily, *see* 5 U.S.C. § 706 (providing that a reviewing court shall "hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Each statutory obligation constrains the Executive's discretion, and, at some level, each subjects the Executive to judicial review of its discretionary decisions to ensure that it abides those constraints. The procedural and substantive burdens these Acts impose prevent the Executive from acting when it otherwise would have in some cases and, in others, cause the Executive to implement the laws in ways that it otherwise would

not. Yet, the limitation on the range of permissible actions that NEPA and the APA impose do not violate the principle of separation of powers because those acts of Congress, like the SIAA, are the laws that the Executive is charged with executing.

This is not to say that it is impossible for Congress to enact a law that impermissibly impinges on the Executive's constitutional prerogatives. Unquestionably, Congress could do so. For instance, if Congress were to subject the Executive's exercise of its core prosecutorial discretion to review by the courts, or, even more dramatically, to condition a significant level of funding on the exercise of the Executive's pardon or appointment powers in a particular manner, legitimate questions as to the effect of those limitations on the independence of the Executive could be raised. *See, e.g., Buckley,* 424 U.S. at 134, 96 S.Ct. 612 (holding that Congress' constitutional power to regulate elections did not allow it to "vest in itself, or in its officers, the authority to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so"); *I.N.S. v. Chadha,* 462 U.S. 919, 935 n. 8 & 953 n. 17, 103 S.Ct. 2764, 77 L.Ed.2d 317 (reserving the question of whether Congress "retain[ed] the power ... to enact a law, in accordance with the requirements of Article I of the Constitution, mandating a particular alien's deportation, unless, of course, other constitutional principles place substantive limitations on such action," but noting then-Attorney General Jackson's attack on such a law as "an historical departure from an unbroken American practice and tradition"). But it is to say that the SIAA's mandate that the *government* compensate injured parties for the negligent exercise of the Executive's discretion in implementing the laws does not even arguably do so.

### 2.

Not only does the SIAA not impinge directly on the Executive's authority to execute the laws, it does not even do so indirectly through the fisc, underscoring even further the constitutionality of the Act as written. The SIAA exposes only the *government* to liability in tort for its discretionary acts; it leaves both the individual Executive agencies and the Executive officers that serve them free to employ their discretion without concern that the injuries caused by their occasional errors will leave the agency without the means necessary to execute the laws and without concern that personal capacity liability will exist. To this purpose, the SIAA provides that suits be brought against the United States and that judgments be paid, not from the individual agency budgets, but instead from a special fund set up by Congress or, if that fund is exhausted, from the federal treasury. *See* 46 U.S.C. app. § 748. Thus, just as there can be no argument that the SIAA impairs the Executive's execution of the laws simply by altering the scope of the Executive's permissible conduct, *see supra* at 367–69, there can be no argument that the SIAA does so indirectly by restricting the *capacity* of the Executive agencies or the *willingness* of Executive officers to act in execution of the laws. Taken on its own terms, the SIAA plainly does neither.

Executive agencies charged with execution of the laws may act more cautiously or, in certain circumstances, decide not to act where they otherwise would have, concerned with the impact of potential liability on the federal treasury. But, if this is the case, it is so because Congress has made the policy judgment that the government must compensate those that it injures whenever a private individual would have to do so in a like circumstance and has accepted the consequence of this liability.

This is a judgment Congress is entitled to make and, as importantly, one that we are not. No less than with the FTCA, the government's concern that a contrary interpretation would impose "a heavy burden ... on the treasury," is not itself sufficient to raise constitutional concerns. *Rayonier,* 352 U.S. at 320, 77 S.Ct. 374. As the Supreme Court explained in *Rayonier:*

> Congress was aware that when losses caused by such negligence are charged against the public treasury they are in effect spread among all those who contribute financially to the support of the Government and the resulting burden on each taxpayer is relatively slight. But when the entire burden falls on the injured party it may leave him destitute or grievously harmed. *Congress could,* and apparently did, decide that this would be unfair when the public as a whole benefits from the services performed by Government employees.

*Id.* (emphasis added). In the face of such clear instruction, all the more remarkable is the majority's underlying reasoning that Congress is *not* empowered under the Constitution to make the same judgment about discretionary functions that the Supreme Court held in *Rayonier* to be firmly within Congress' power with respect to "uniquely governmental" ones.

### 3.

The majority contends that "the Supreme Court has made clear that the discretionary function exception contained in the FTCA is grounded in separation-of-powers concerns," citing in support of this contention the Supreme Court's opinion in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 810, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). *Ante* at 341. The Supreme Court's decision in *Varig Airlines* held no such thing, however. In that

case, the Court set forth the *policy considerations* that motivated Congress' creation of a discretionary function exception in the FTCA; it did not say that these motivations originated in concerns about potential separation-of-powers problems. In fact, as the majority is compelled to concede, the phrase "separation of powers" does not appear anywhere in the Court's opinion. *Ante* at 341.

The majority dismisses the absence of any mention of separation of powers as nothing more than mere oversight. It writes, "Although *Varig* does not use the phrase 'separation of powers,' the Court's explanation of the purpose behind the exception makes it clear that the exception is a statutory *embodiment* of separation-of-powers concerns." *Ante* at 341 (emphasis added). The Fifth Circuit may have believed this to be the case, *id.* (citing *Payton v. United States,* 636 F.2d 132, 143 (5th Cir.1981) (claiming that, "[t]he crux of the concept *embodied* in the discretionary function exception is that of the separation of powers")), but, as even the passage from *Varig Airlines* relied upon by the majority demonstrates, the Supreme Court has given no indication that it agrees. The majority's attempt to inject constitutional principle into Congress' policy judgments via *Varig Airlines* is untenable, plain and simple.

The relevant passage from *Varig Airlines* provides as follows,

> *Congress* wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, *Congress* took steps to protect the Government from liability that would seriously handicap efficient government operations.

*Ante* at 341 (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755) (emphasis added). This passage not only does not mention separation of powers, it talks plainly *and only* of the *policy considerations* that influenced Congress' decision to create a discretionary function exception in the FTCA. Neither policy consideration, in and of itself, demonstrates—even implicitly—that separation-of-powers concerns motivated Congress' adoption of a discretionary function exception; necessarily, neither "makes clear" that this was the case. *Ante* at 341; *id.* at 348 (citing *Varig Airlines* for the proposition that separation-of-powers concerns "drove Congress to create the discretionary function exception to the FTCA").

To begin, that Congress acted out of an aversion to judicial second-guessing does not necessarily imply anything at all as to separation of powers. As the Supreme Court made clear in *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), judicial review of Executive policy decisions is not, without more, an impermissible encroachment on the Executive. *See id.* at 211, 217, 82 S.Ct. 691 (explaining that separation-of-powers principles require courts to avoid decision "of 'political questions,' not ... political 'cases'"). Of course, the mere fact that judicial review of such Executive decisions is *permitted* by the Constitution does not mean that it is desirable in all cases in which it is available. Congress could therefore decide that the courts should not review (or "second-guess") a particular class of Executive decisions as *a matter of policy,* without implying that the authorization of such review would constitute an unconstitutional encroachment on the Executive. In fact, the context in which the *Varig Airlines* Court describes Congress' concern about judicial second-guessing suggests, if anything, that Congress made

just this judgment—and only this judgment—with regard to the FTCA. The next sentence in the Court's opinion indicates that Congress sought to avoid judicial second-guessing, not because Congress was concerned about the judiciary's assumption of the Executive function or about the Judiciary's inability to adjudicate the propriety of the Executive's discretionary actions, but rather because "judicial second-guessing" could subject the government "to liability that would seriously handicap *efficient government* operations." *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. 2755 (emphases added).

Even less does the fact that Congress decided to include a discretionary function exception in the FTCA "to protect the *Government* from liability that would seriously handicap efficient government operations," demonstrate, or even imply, that Congress did so in deference to separation-of-powers principles. Separation-of-powers principles are solely concerned with the inter-relationships between the three constitutional branches of government. Neither Congress' desire to protect the government from liability nor its interest in promoting efficient government operations relates in any way to these relationships. It may be, as the Supreme Court suggested in *Varig Airlines*, that the government would operate more efficiently if it were immune from tort liability for the Executive's negligent discretionary acts, but that Congress has chosen to sacrifice some degree of efficiency in order to provide compensation for persons injured by such acts does not imply anything with

regard to the constitutionality of that judgment.

Thus, notwithstanding the majority's contention to the contrary, *Varig Airlines* offers no guidance whatsoever as to whether the discretionary function exception is required by separation-of-powers principles.

### B.

I turn then to the majority's concern that, if the SIAA is construed to waive the government's immunity for discretionary functions, the judiciary will be called upon to answer questions "it is not equipped to resolve." *Ante* at 342. Though the majority does not recognize that it does so, this separation-of-powers concern, at its heart, asks whether the instant case presents issues so far beyond the judicial competence as to pose an essentially political question, rendering the case non-justiciable. *See Baker*, 369 U.S. at 211, 82 S.Ct. 691 ("The nonjusticiability of a political question is primarily a function of the separation of powers."). Indeed, the majority's fear that "the judiciary would be called upon to decide issues it is not equipped to resolve," mirrors the Supreme Court's recitation of two of the prominent characteristics of non-justiciable cases under the political question doctrine: "a lack of judicially discoverable and manageable standards for resolving [the case];" and "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." *Id.* at 217, 82 S.Ct. 691.[5]

---

**5.** The six independent tests for the existence of a political question set forth in *Baker* are:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrass-

Looking to the Supreme Court's political question jurisprudence as guidance, I agree that the SIAA may well authorize some suits that call upon the courts to make political judgments that they are neither prepared to make, nor capable of competently making. *See, e.g., Coates v. United States*, 181 F.2d 816, 817 (8th Cir. 1950) (dismissing suit against government alleging negligence in decision to change the course of the Missouri River). I also agree that these problems may be sufficiently severe in certain cases that a court would be justified in declining to decide a case otherwise properly before it. *See, e.g., Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (dismissing, on the basis of the political question doctrine, claim challenging "the complex, subtle and professional decision as to the composition, training, equipping and control of a military force"); *Dep't of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (refusing to review the Navy's decision not to grant security clearance to plaintiff).

These separation-of-powers concerns, however, do not warrant the wholesale creation of a broad exception to the SIAA's waiver of sovereign immunity for all discretionary functions.[6] Indeed, separation-of-powers principles, as expressed through the political question doctrine, eschew this sort of sweeping judicial pronouncement. That a case pertains to a discretionary function, even a highly sensitive or political one, is not enough for a case to be deemed nonjusticiable.[7] *See Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 229, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (affirming *Baker*'s observation that "not every matter touching on politics is a political question"); *Hopson v. Kreps*, 622 F.2d 1375, 1378 (9th Cir.1980) ("The analysis in *Baker* makes it clear that the criteria there generally do not apply to claims that the executive has exceeded specific limitations on delegated authority."). As is likely to be relevant to

ment from multifarious pronouncements by various departments on one question.
*Baker*, 369 U.S. at 217, 82 S.Ct. 691. To the extent that the majority's separation-of-powers concerns extend beyond those identified in the second or third of these tests to other of the six conditions listed in *Baker*, I do not believe that those additional concerns would alter, in any meaningful way, a court's calculus in determining whether any particular case presented a political question. And, in any event, my ultimate conclusion—that the political question doctrine is sufficient to address separation-of-powers issues that may arise from suits brought under the SIAA—remains unchanged.

6. Again in overstatement, Judge Wilkinson contends that, if the SIAA is interpreted not to include a discretionary function exception, the Executive would be "disable[d] ... from invoking separation-of-powers principles via its discretionary functions as a defense to unlimited tort liability." *Ante* at 351 (Wilkinson, J., concurring). Of course, this is not so. The discretionary function exception is not coterminous with that which separation-of-powers principles forbids the court from deciding. Separation-of-powers principles bar the courts from deciding political *questions*, not political *cases*. *Baker*, 369 U.S. at 210–11, 82 S.Ct. 691. Thus, even absent a discretionary function exception, the government may vindicate its concerns about separation of powers by arguing, for instance, that the issues the court is called upon to resolve in any given case present essentially political questions and, therefore, that the case is nonjusticiable.

7. In the administrative law context, the courts are regularly called upon to consider the propriety of the Executive's policy decisions, and, within broad limits, *see Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (providing that there is a "narrow" exception to reviewability of agency action under the APA for those instances in which "no judicially manageable standards are available for judging how and when an agency should exercise its discretion"), the courts have embraced the opportunity.

the SIAA, the court must also lack "judicially discoverable and manageable standards" for judging the propriety of the Executive action or the standard that exists must require the court itself to make a "policy judgment of a kind clearly for nonjudicial determination." *Baker,* 369 U.S. at 217, 82 S.Ct. 691. Accordingly, the inquiry as to whether a particular case is justiciable "is itself a delicate exercise in constitutional interpretation" and must be conducted on a "case-by-case basis." *Id.* at 211, 82 S.Ct. 691. On this point, the Supreme Court could not have been more clear:

> The doctrine of which we treat is one of 'political questions,' not one of political 'cases.' The courts *cannot reject* as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. *The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.*

*Baker,* 369 U.S. at 217, 82 S.Ct. 691; *see also id.* at 211, 82 S.Ct. 691 (providing that "the 'political question' label" obscures "the need for case-by-case inquiry"); *Schroder v. Bush,* 263 F.3d 1169, 1173–74 (10th Cir.2001); *Hopson,* 622 F.2d at 1378. This passage is not merely hortatory. The question of a case's justiciability is a "delicate exercise in constitutional interpretation" precisely because the courts are obliged to decide those cases where there are objective, legal standards to guide their decisions, no less than they are obliged to demur when they find themselves without manageable legal principles.

*See Baker,* 369 U.S. at 217, 82 S.Ct. 691 (providing that, "unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence"); *cf. Johnson v. Collins Entertainment Co., Inc.,* 199 F.3d 710, 729 (4th Cir.1999) (Luttig, J., concurring in the judgment) ("If Congress sees fit to provide citizens with a particular cause of action, then we as federal courts should entertain that action—and unbegrudgingly.").

In light of this command, the majority's exception of all discretionary functions from the SIAA's waiver of sovereign immunity is especially unsustainable. *Ante* at 342–43 (providing that "where the executive's discretionary functions are at issue, interference from the judicial branch is inappropriate"). For it is a wildly overinclusive remedy for an ill that is likely to appear only in a relatively small set of cases. In the vast majority of claims involving the Executive's discretionary functions, the courts will not find themselves bereft of "judicially discoverable or manageable standards" or compelled to make "a policy judgment of a kind clearly for nonjudicial discretion," *see Baker,* 369 U.S. at 217, 82 S.Ct. 691, even if the governmental actions or omissions that those courts are reviewing were themselves made for policy or political reasons.[8] *See, e.g., Graves v. United States,* 872 F.2d 133 (6th Cir.1989) (suit against government involving its placement of signs around dam); *B & F Trawlers, Inc. v. United States,* 841 F.2d 626 (5th Cir.1988) (suit against government for negligence in

---

8. In confirmation of the courts' competence in this respect, the courts have universally held that municipalities may be subjected to liability under 42 U.S.C. § 1983, both for the discretionary acts of their Executive officials *and* even for the unconstitutional enactments and actions of their local legislature. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (discretionary actions); *Berkley v. Common Council of the City of Charleston,* 63 F.3d 295 (4th Cir.1995) (*en banc*) (legislative enactments).

"care, custody and control" of seized vessel); *Faust v. South Carolina State Highway Dep't,* 721 F.2d 934 (4th Cir.1983) (suit against government for Coast Guard and Army Corps of Engineer's failure to mark a ferry cable across a navigable waterway); *Bearce v. United States,* 614 F.2d 556 (7th Cir.1980) (suit against government for Coast Guard's failure to erect a light at the end of a harbor); *Meagher v. United States,* 170 F.Supp.2d 960 (N.D.Cal.2001) (suit against the government for decision to donate ship without removing certain bulkheads); *Eazor Express, Inc. v. United States,* 611 F.Supp. 197 (E.D.N.Y.1985) (suit against the government for decision to allow independent contractor to dredge in the vicinity of support bulkheads). In fact, as the majority itself explains, the courts regularly entertained challenges brought under the SIAA to discretionary government actions prior to the Act's amendment in 1960, and review of each of these cases bears out that the courts were more than competent in applying standard tort law principles to the government's discretionary functions.[9] *Ante* at 346–48. In cases brought under the SIAA, the courts are not called upon to decide whether the Executive's decision

was wise as a matter of policy. Rather, they are called upon to decide only whether what Congress and the President determined to do as a matter of policy was done negligently. The courts must not, and, under Supreme Court precedent, cannot, avoid decision of these cases—and thereby deny to the injured parties that which the SIAA provides to them—on the speculation that it would be improper for them to adjudicate related, but different, claims.

Reference to the case before the court today makes this point forcefully. The plaintiffs have sued the government to recover damages for the injuries they incurred when they plummeted twenty-five feet over a dam. They allege that the government had a duty to warn them about the existence of this dam and that the signs the government posted in an attempt to fulfill this duty were inadequate to do so. Both questions are readily susceptible to judicial resolution under established principles of tort law, as the panel opinion's able discussion readily demonstrates, *see McMellon v. United States,* 338 F.3d 287, 293–306 (4th Cir.2003) (holding, after a lengthy discussion, that the

**9.** The majority's attempt to mitigate the significance of these decisions falls flat. *Ante* at 348 (suggesting that "the failure to address the issue [of separation of powers] could ... be attributed to ... the government's failure to press the issue"). Whether or not the government raised the separation-of-powers issue, the fact of the courts' adjudication of the challenged government actions in the five cases cited by the majority *by itself* establishes that the Supreme Court and the courts of appeals that decided them viewed the discretionary functions involved therein to be readily susceptible to judicial review. And nothing more is required to demonstrate that, contrary to the majority's assertion, separation-of-powers principles do not bar the judiciary from adjudicating the legality of a significant portion of the Executive's discretionary functions.

The two cases which the majority relies upon for its assertion that the caselaw was "ambiguous" prior to 1960, *Mandel v. United States,* 191 F.2d 164 (3d Cir.1951), *aff'd sub nom. Johansen v. United States,* 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051 (1952), and *Dougherty Co. v. United States,* 207 F.2d 626 (3rd Cir.1953) (*en banc*), are the exceptions that prove the rule. *See ante* at 347. In both cases, the Third Circuit refused to decide claims questioning the judgment of military authorities made under extreme duress, claims the courts have long held to be nonjusticiable. *See Gilligan,* 413 U.S. at 9, 93 S.Ct. 2440; *Tiffany,* 931 F.2d at 278–79. Such cases *do not,* of course, prove that, before 1960, some courts held the Judiciary to be incompetent to adjudicate the propriety of the Executive's discretionary functions *writ large,* as the majority does today.

government had a duty to warn the plaintiffs); *id.* at 313–15 (Niemeyer, J., dissenting) (reaching the opposite conclusion, also on the basis of tort law principles), and neither question raises even a hint of separation-of-powers concerns. In such a case, the SIAA entitles the plaintiffs to their day in court, and, in my judgment, the court errs by denying it to them.

### C.

The weakness of Judge Wilkinson's concurrence renders his opinion a millstone for the majority; indeed, through his opinion, one can sense the desperateness in the majority's analysis. Resting, as it does, exclusively on attempted policy rationales and offering nothing at all in the way of legal analysis, the concurrence is little short of a full admission that the majority's holding actually violates the very separation-of-powers principles in the name of which it embraces its interpretation of the SIAA.

### 1.

Judge Wilkinson approaches decision of the question before us as if he were an interested legislator, rather than a neutral interpreter of a legislature's enactment. Instead of determining what the law *is,* he undertakes to determine what, in his view, the law *should be.* Thus, when he insists that "any different result [than the one he reaches] would not be supportable[,]" *ante* at 350, it is plain upon reading his opinion that he believes this so only in the sense that a different result would not meet with his view of the result most desirable as a matter of policy preference, not because a different result would be unsupportable in law. In fact, Judge Wilkinson fully joins in the court's opinion holding that the SIAA unambiguously does *not* contain a discretionary function exception, a joinder

inconsistent with any other understanding of his opinion.

With scarcely even a mention of the statute that Congress enacted and that we are charged with interpreting, Judge Wilkinson speaks repeatedly in the language of legislative deliberation. Throughout his opinion, he references what we are asked to do, as if Congress' actions were irrelevant. Illustrative is the following:

> [A]ppellants ask us to go much, much farther [than declaring the discretionary function exception inapplicable to this case]—to indulge in effect the broadest possible waiver of sovereign immunity for the performance of every discretionary governmental function and to disregard the principle that such waivers of immunity must be narrowly construed.

*Ante* at 350. But appellants do not ask of us what Judge Wilkinson says they do. They ask only that we interpret the statute as it was written by Congress. And, of course, this is all that we are empowered to do. Notwithstanding Judge Wilkinson's suggestion to the contrary, we are not empowered, in this case of straightforward statutory interpretation, to formulate the desirable scope of sovereign immunity *ex cathedra.*

Judge Wilkinson believes that the principle that waivers are to be "narrowly construed" is relevant in this case, and he charges that appellants have asked the court both "to indulge in effect the broadest possible waiver of sovereign immunity for the performance of every discretionary government function and to disregard the principle that such waivers of immunity must be narrowly construed." He is mistaken on both counts, not only as to the governing law, but also as to the arguments advanced by appellants.

As to the law, the principle that, absent the applicability of any other principle of interpretation, waivers are to be construed

narrowly quite obviously does not even have any arguable application in this context. The waiver in the SIAA is unambiguous, as the majority opinion that Judge Wilkinson joins concludes. *See ante* at 339. Thus, under Supreme Court authority, there is no waiver that can permissibly be narrowed—or enlarged, for that matter. Congress has determined the scope of waiver in the SIAA, and that scope may not be altered by judicial gloss of the kind superimposed by Judge Wilkinson.

As to the arguments made by appellants, nowhere do they ask that the principle that waivers be narrowly construed be disregarded; Judge Wilkinson's charge in this respect is but convenient strawman. Appellants understand, as does the majority, that that principle is altogether inapplicable in this case. And, of course, neither do they ask the court to "indulge in effect the broadest possible waiver of sovereign immunity for the performance of every discretionary government function." *Ante* at 350 (Wilkinson, J., concurring). This, too, is convenient hyperbole. All that appellants ask us to "indulge" is Congress' intent in enacting the SIAA, as revealed by conventional statutory interpretation. It is conventional statutory interpretation that disposes of this case, and it is precisely such that forecloses Judge Wilkinson's interpretation. It is true that sovereign immunity waivers should not be "enlarged beyond what the [statutory] language requires[,]" *U.S. Dep't of Energy v. Ohio,* 503 U.S. 607, 615, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992) (internal quotations omitted), as Judge Wilkinson notes. *See ante* at 350. But conventional statutory interpretation does not require or even entail such an enlargement.

With his misplaced view of the question before us as a guide—that is, the desirability, as opposed to the applicability, of a discretionary function exception—Judge Wilkinson decides the interpretive question presented by importing wholesale into the SIAA a discretionary function exception from an entirely different statute, the FTCA. This he does (quite remarkably) at the same time, and even though, he joins the majority's holdings both that the SIAA unambiguously omits such an exception and that the FTCA's exception cannot provide a basis for reading an exception into the SIAA because "[i]f the exception remained as important to Congress in 1960 when it amended the SIAA as it was when the FTCA was enacted, then it stands to reason that Congress would have written the exception into the SIAA then." *Ante* at 339 (citing *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 193 (2nd Cir.1991)).

Notwithstanding his asserted agreement with the majority, Judge Wilkinson concludes, inconsistently with the majority and in sleight of hand, that "[t]he language that this court applies today is not language that the judiciary has somehow made up on its own. Rather, the Court adopts Congress's own explicit expression of separation-of-powers principles in 28 U.S.C. § 2680(a)." *Ante* at 350. He observes that the "discretionary function test in the FTCA" is carefully crafted language that resolves this case. *Ante* at 352. All of this as if we were interpreting the FTCA. Though I would have thought it obvious, it apparently warrants noting that the statute at issue today is not the *FTCA,* 28 U.S.C. § 2680(a), as Judge Wilkinson seems to believe, but, rather, the *SIAA,* 46 U.S.C. §§ 741–52. Thus, Judge Wilkinson's statement that the language that the court interprets has been "carefully crafted" and "resolves this case," *ante* at 351 must be understood as what it is, incredible. For, by the "carefully crafted" language, Judge Wilkinson means not the language in the *SIAA,* but, rather, the language in the *FTCA,* language that does

not even appear in the act that we are called upon to interpret today.

Judge Wilkinson suggests that interpreting the SIAA not to include an exception for discretionary functions, "jettison[s] congressional language tailored to this very context—governmental tort liability." *Ante* at 352. This suggestion is likewise incredible as a judicial observation: The language that Judge Wilkinson suggests would be "jettisoned" does not even appear in the statute we are interpreting. In fact, so confused is the concurrence that this is the entire point of the *dissent,* not the *majority:* Congress "jettisoned" from the SIAA the exception that it chose to include in the FTCA. And it is this fact that confirms that there is no discretionary function exception in the SIAA and that none was intended—at least under established principles of law.

Unconcerned by the methodological indefensibility of importing into one statute *in* applicable language from an entirely different statute (not to mention the indefensibility of doing so, while at the same time acknowledging the inapplicability of that statutory language), Judge Wilkinson defends his eye-opening mode of interpretation by arguing that "[t]he fact that we have at hand such a carefully crafted expression of separation-of-powers principles from a coordinate branch of government rebuts any suggestion that the court is somehow on a *statutory frolic* of its own." *Ante* at 351 (emphasis added). Whether or not the majority, in whose opinion Judge Wilkinson joins but with whom he demonstrably disagrees almost entirely, is on a "statutory frolic" in its different and conflicting analysis, such a mix-and-match of admittedly inapplicable language from different statutes as that performed by Judge Wilkinson certainly does constitute a "statutory frolic," at least under conventional canons of statutory interpretation.

Even putting aside Judge Wilkinson's own acknowledgment that the language from the FTCA that he would import into the SIAA is not applicable, traditional statutory interpretation not only does not require, it forbids, us to mine all extant statutes, relevant or not, for language that *would have* decided the issue if Congress *had* chosen to include it in the statute under consideration. Suffice it to say that this "method of interpretation" is no more legitimate if we only include language from other statutes if, in our view, Congress had "no practical reason for differentiating" between the two acts. *Ante* at 352 (Wilkinson, J., concurring). The judgment that Congress had no practical reason for differentiation is naked policy judgment.

2.

The policy decisions that inform Judge Wilkinson's interpretation would be at least somewhat more palatable if they were attended by legal analysis in support of (even if only incidentally) the policy objectives that underlay the decisions. But instead of identifying particular constitutional impediments to the application of this unambiguous statute as it is incumbent upon him to do, Judge Wilkinson merely references nonspecific separation-of-powers "concerns" and offers roaming generalities about the importance of Executive discretion. Though speaking generally and loosely throughout his opinion of separation-of-powers "concerns," he never once attempts to identify these "concerns" and he provides no constitutional authority that even hints that his "concerns" might require his conclusion *as a matter of law.*

Judge Wilkinson notes, for example, that "[t]he executive has an explicit, not an implicit, duty to see that the laws are faithfully executed." *Ante* at 350 (citing U.S. Const. art. II, § 3). That the Executive has an explicit duty to execute the

laws is of course true—but in this context, utterly irrelevant. Rather than detailing how the Executive's constitutional duty is impeded by the SIAA as written, Judge Wilkinson goes on to assert conclusorily that "[t]his duty cannot be discharged without the exercise of some discretion." *Ante* at 350. Again, it is not disputable, nor do I dispute, that "some discretion," such as the "Executive's exercise of its core prosecutorial discretion," is fundamental to Executive power. *Supra* at 369. But this is to say nothing of relevance to the disposition of this case. Talismanic reference to Article II simply does not substitute for legal analysis addressing the question of whether the limit on Executive discretion imposed by Congress in the SIAA impermissibly infringes on those Article II powers. Judge Wilkinson attempts no answer whatsoever to the only relevant question of what it is about the SIAA as enacted that offends separation-of-powers principles so grievously, even in light of the protection afforded Executive discretion under the political question doctrine.

Nor does Judge Wilkinson's analogy to qualified immunity serve, even indirectly, as the identification of a separation-of-powers "concern" that would authorize this court's refusal to apply the SIAA as written. Judge Wilkinson references this "concern" in this way:

> The discretionary function exception is thus implied only in the same sense that the doctrine of qualified immunity is implied in the interpretation of 42 U.S.C. § 1983—on the premise that without the ability to exercise some element of judgment in the execution of law, neither federal, state, nor local government could function.

*Ante* at 350. But reference to a *common law* immunity that is read into the "general language of § 1983" provides no support

for reading an exception into a statute that unambiguously waives immunity.

Perhaps realizing that Congress has the authority to override common law immunities through the use of express waivers—like the SIAA—Judge Wilkinson claims that "qualified immunity is an example of 'reading into' a statute a degree of immunity in order to satisfy, among other things, separation-of-powers concerns," *ante* at 350 n. 1, thereby implying that the same separation-of-powers concerns that supposedly underlie qualified immunity are relevant to the disposition of this case. Of course, Judge Wilkinson is able to cite no authority for his claim that qualified immunity under section 1983 vindicates constitutional separation-of-powers concerns. And this is unsurprising: The Supreme Court has repeatedly rooted such immunity in the common law, not the Constitution. *See Scheuer v. Rhodes,* 416 U.S. 232, 241, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (noting that the Constitution provided limited immunity for legislators, but that "immunity for the other two branches—long a creature of the common law—remained committed to the common law"); *Owen v. City of Independence,* 445 U.S. 622, 634, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) ("[Section] 1983 immunity" is "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interest behind it.").

Though he believes otherwise, *see ante* at 351 (Wilkinson, J., concurring) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)), *Varig Airlines* is similarly unavailing as support for Judge Wilkinson's disregard of the SIAA's text on the grounds of separation-of-powers "concerns." The fact that the Court in *Varig Airlines* took note of Congress' concern

that the absence of a discretionary function exception in the FTCA would result in too much "judicial second-guessing" does not imply that Congress believed—let alone that this court must hold—that this sort of "judicial second-guessing" was a violation of constitutional principles of separation of powers in the FTCA, much less that it would be such in the SIAA. Judge Wilkinson colorfully, but analytically meaninglessly, notes that "[e]ven in our modern age, however, some things are indeed what they seem." *Ante* at 351. He draws from the fact that Congress wanted to limit judicial power in the context of the FTCA that "[t]he discretionary function exception expresses Congress' view of that degree of 'separation' required by the executive branch to carry out its duties." *Id.* Of course, this is not at all what is most naturally and reasonably to be inferred from Congress' inclusion of a discretionary function exception in the FTCA. All that can be legitimately inferred is that Congress believed as a policy matter and with respect to those matters covered under the FTCA that a limitation on the role of the courts of the kind enacted was preferable. An inference, from the inclusion of this exception, as to broad congressional intent regarding the constitutionally mandated structure of government across the whole of the United States Code, of the kind that Judge Wilkinson draws, is not even plausible as a matter of interpretation.

Finally, in what is presented as the jewel in his crown of authority in support of his interpretation, Judge Wilkinson resorts to what he grandiosely refers to as the "considered wisdom of ten other circuit courts of appeals." But this last effort fares hardly better than any of his other efforts. We do not determine whether to invalidate a statute based on what our sister circuits have done, and I would not have thought one would want to be seen as proceeding in this way. Judicial interpretation is not an exercise in poll-taking, or at least it should not be. In any event, Judge Wilkinson himself does not even appear to believe that we are in receipt of especial wisdom from our sister circuits on the question with which we are today presented. He joins fully in the majority's opinion that all but says (and it, correctly) what is, at least by connotation, precisely the opposite. *See ante* at 344 (noting the "cursory analysis" of our sister circuits on the issue we address herein).

3.

As telling as Judge Wilkinson's failure to identify any constitutional or statutory authority for his conclusion is his complete avoidance of the one doctrine—the political question doctrine—that does indisputably resolve any valid separation-of-powers concerns that might exist under the interpretation compelled by the statute's language.

Judge Wilkinson asserts that the failure to imply a discretionary function exception to the SIAA will subject the United States to "tort duties and negligence actions, for attempts to enforce immigration law; to intercept narcotics-smuggling; to protect its airspace from hostile, incoming aircraft; and to safeguard its harbors from biological agents in container cargo." *Ante* at 351. However, he does not explain how these hypotheticals are beyond the reach of the political question doctrine, and indeed does not even assert that the doctrine will be unable to resolve them. And, in fact, the political question doctrine is well suited to answering questions such as those Judge Wilkinson rhetorically poses. *See supra* at 372–76. *See also Gilligan*, 413 U.S. at 10, 93 S.Ct. 2440. If this were not otherwise evident, Judge Wilkinson himself has previously said as much, holding in *Tiffany*, 931 F.2d at 277–79 (quoting *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691), that, even where "the discretionary

function exception alone does not capture all the important aspects of [the] case," there was no judicial review of a midair collision between military and civilian aircraft because "[j]udges have no 'judicially discoverable and manageable standards for resolving' whether necessities of national defense outweigh risks to civilian aircraft" and cannot "undertake independent resolution without expressing lack of the respect due coordinate branches of government."

Judge Wilkinson's only criticism of the political question doctrine is that it "substitut[es] ... a judicially-derived doctrine for congressionally-crafted language," *ante* at 352, implying that this case calls upon the court to choose between two competing exceptions to Congress' waiver of sovereign immunity, one devised by Congress and the other developed by the judiciary. Of course, there is no such choice presented to us in this case. In the face of Congress' clear and unequivocal waiver of sovereign immunity in the SIAA, the courts are not authorized to choose the level or type of Executive activity that they believe should be excepted from the SIAA's waiver. And this limit on our authority obtains even when we believe—if not especially when we believe—as Judge Wilkinson emphatically does, that the level of liability created by the Act's broad waiver of immunity would unduly hamper government operations, *see ante* at 351–52. Indeed, the courts are constitutionally *barred* from making such a legislative determination under the circumstances here. We are under obligation to adjudicate *all* claims authorized by the language of the SIAA, unless the decision of those claims would itself *violate* (not merely raise "concerns" as to) separation-of-powers principles.

While the political question doctrine brings the court face-to-face with the sepa-ration-of-powers inquiry, *see Baker,* 369 U.S. at 211, 82 S.Ct. 691 (providing that the political question doctrine is "primarily a function of the separation of powers"), the application of the discretionary function exception does not, *supra* at 374–76. And, on this point as well, Judge Wilkinson's silence is telling: although he allows that the government's alleged failure to post signs before a dam in this case may constitute a discretionary function, he does not even begin to explain how a court's application of tort law principles to that decision would violate the doctrine of separation of powers.

4.

In sum, in order to offer any support whatsoever for the majority (with whom he essentially disagrees) and the interpretation that he favors (which is irreconcilable with the majority's, with which he claims full agreement), Judge Wilkinson must at least identify the Executive discretion that is *both* violated by the SIAA's unambiguous waiver of sovereign immunity *and* unprotected by the political question doctrine. This issue, he fails even to address, offering instead only vague platforms about the importance of Executive discretion. In the end, such but serves as powerful reinforcement of the sense that lingers after reading the majority opinion, namely, that even were it legitimate to support the majority's interpretation with arguments of judicial *policy* preference, which to its credit the majority does not attempt and which Judge Wilkinson dares to attempt but fails to succeed in doing, that interpretation cannot possibly be supported as a matter of *law.* And, of course, it is only the latter with which we ought be concerned.

III.

Just as the principle of separation of powers directs that courts be wary of ex-

ceeding their prescribed role to adjudicate "cases and controversies," it also charges that they be vigilant in fulfilling their constitutional obligation to decide the cases properly before them. In a narrow set of cases which the Supreme Court has denominated "political questions," this obligation must give way in favor of even more pressing constitutional imperatives. Yet, in all cases, the determination of whether a case is sufficiently outside the judicial competence to decide, constitutes a "delicate exercise in constitutional interpretation," one that may only be undertaken on a case-by-case basis. *Baker*, 369 U.S. at 211, 82 S.Ct. 691. The majority's decision today to exempt from the SIAA's waiver of sovereign immunity all liability arising from the government's discretionary functions, carelessly abandons this cautious case-by-case analysis in favor of a categorical exception. This decision, though purporting to be grounded in the principle of separation of powers but which Judge Wilkinson's opinion reveals to be nothing more than a naked policy judgment, actually constitutes an affront to this principle, by usurping the legislative prerogative that it professes to protect and abdicating judicial responsibility where the Constitution requires that it be exercised—both out of a perceived need to guard against an encroachment on the Executive power that does not even arguably exist.

The SIAA clearly expresses the will of Congress that individuals injured by the government be permitted to maintain suit against it wherever they could maintain a suit against private individuals in a like situation. The majority itself recognizes that this was the "clear and unequivocal" intent of Congress. I would give interpretative effect to this clearly expressed will, as we are required to do, and I dissent from the majority's failure to do so.

GREGORY, Circuit Judge, dissenting:

The majority's decision to read an implied discretionary function exception into the SIAA is based solely on separation of powers concerns. In reaching its decision, however, the majority circumvents traditional principles of statutory construction, and further fails to explain how the separation of powers doctrine is implicated by the plain language of the statute. I agree with the reasoning proffered in Parts I, II. A and B of Judge Luttig's dissenting opinion. For those and the other reasons that follow, I must dissent.

As the majority concedes, "[t]he first step [of statutory construction] is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Ante* at 339 (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (citations and internal quotation marks omitted)). The language of the SIAA is unambiguous. Indeed, as the majority states, "the plain language of the SIAA seems to reflect a Congressional intent that discretionary acts should *not* be excluded from the waiver of sovereign immunity." *Ante* at 339. Thus, the majority's inquiry should have ceased upon reading the text of the statute. Nevertheless, after conceding that the statutory language is unambiguous, the majority proceeds to take its inquiry outside the text of the SIAA, and delves into the history of the FTCA in support of its decision to read an implied discretionary function exception into the SIAA. However, the fact that the FTCA, the SIAA's predecessor, contains an express discretionary function exception weakens the majority's position, because if Congress wished to include such a provision in the text of the SIAA, it certainly could have looked to the FTCA for

guidance. Yet, Congress expressly chose not to include the exception in the SIAA, and the majority's attempts to expand an already unambiguous statute are misplaced.

More importantly, the majority fails to demonstrate an independent separation of powers violation that is caused by the lack of a discretionary function exception in the SIAA. In *I.N.S. v. Chadha*, the Supreme Court outlined two ways in which the separation of powers doctrine may be violated: "One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another." 462 U.S. 919, 962–63, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (internal citations omitted). In the instant case, the majority fails to demonstrate how enforcing the SIAA, as written, would result in either of these identified separation of powers violations. Instead, the majority trumpets the fact that ten of our sister circuits, *ante* at 338–39, have included an implied discretionary function exception in the text of the SIAA, and decides to follow suit. However, those courts had no more authority to read into the SIAA a discretionary function exception than we do now. Additionally, the majority provides examples of several cases where courts have enforced the discretionary function exception created by the FTCA, and thereby opines that "it becomes apparent that the absence of such an exception in the SIAA is problematic, to say the least." *Ante* at 342. The majority ultimately concludes, without support, that "[a]s these examples illustrate, if the SIAA does not include a discretionary function exception, the executive branch's ability to 'faithfully execute[ ]' the law, would be substantially impaired." *Ante* at 342 (internal citations omitted). Essentially, the majority holds that because the FTCA has a discretionary function exception, Congress *must* have intended the SIAA, a similar statute, to have an implied discretionary function exception as well. The majority has embarked upon a slippery slope of statutory interpretation with no visible end. Surely, the court cannot suggest, in good faith, that discretionary function exceptions, or any omitted language, be read into mirror-image statutes when one statute contains the exception and the other does not. Nevertheless, the majority reaches this conclusion; one that is best left to the legislature, and not the judiciary, lest we "assume[ ] a function that more properly is entrusted to another." *Chadha*, 462 U.S. at 963, 103 S.Ct. 2764. Because the text of the SIAA is plain and unambiguous and clearly does not contain a discretionary function exception, I conclude that the reasoning in *Lane* is sound. Accordingly, I respectfully dissent.